THE ATTORNEY-GENERAL, in behalf of the state, ex rel. city of Elizabeth, informant, and the city of Elizabeth,

*v.*

THE CENTRAL RAILROAD COMPANY et al.

[Decided November 16th, 1904.]

1. Where an action at law is pending between a city and a railroad company for the settlement of the question as to the existence of a public highway, on an information subsequently filed by the attorney-general, in connection with a bill by the city, to question the validity of the grant under which the railroad company claims, the relief on the information, as well as on the bill, should only be auxiliary to the action at law, and questions of a legal character which have been or may be decided in that action should not be reviewed. *Attorney-General* v. *Central Railroad Co., 61 N. J. Eq. (16 Dick.) 259,* distinguished.

2. Where the state alleges that a riparian grant conveying lands included within the lines of an alleged highway was obtained by false representations as to the termination of the highway, made in the map accompanying the application for the grant, and the question is whether the grant was in fact made in reliance on the representations, and the filing of information to set aside the grant for this reason has been delayed until all the officers who executed it on the part of the state are dead, the delay may not of itself be a bar to relief, but it is sufficient to prevent the state from insisting on the application of a mere rule of evidence as to the burden of proof as the basis of deciding that in the absence of proof to the contrary it must be conclusively presumed, under the facts shown in this case, that the grant in question, so far as it affects the highway, was in fact induced by the representations on the map as to the termination of the highway.

———

Heard on information and bill, answer, replication and proofs.

*Mr. C. Addison Swift* and *Mr. Frank Bergen,* for the informant and complainant.

*Mr. John L. Conover* and *Mr. Richard V. Lindabury,* for the defendants.

EMERY, V. C.

A grant, made by the riparian commissioners to the Central Railroad Company of New Jersey, for a tract of land under and along the waters of Staten Island sound, within the limits of the city of Elizabeth, is brought in question by this information and bill, the general object of which is to have the grant declared void as to a portion of the tract which is alleged to be within the lines of a public highway.

On November 12th, 1874, the riparian commissioners, together with the governor of the state, granted and conveyed to the defendant, the railroad company, twelve tracts of land, seven of which were situated in Hudson county (four in the waters of New York bay, and two in the Kill von Kull, and one in Newark bay); three in Union county (in the waters of New York bay and Arthur's Kill), and two in Middlesex county, one in the Arthur's Kill and one in the Raritan river. For ten of the tracts, being all except the first and the ninth, the inner boundaries of the respective tracts were fixed by the grant at "high-water mark." In the case of two of the tracts, the *first* and the *ninth,* the tracts conveyed are described as being formerly under tidewater, but now partly above tidewater, and for the first tract the shore line is fixed as "the ordinary high-water mark of the bay of New York or Communipaw cove, as the same existed in 1804." The ninth tract, which is the only one now in question, lies in the Arthur's Kill or Staten Island sound, on the north side of the outlet of Elizabeth river, and is described as a tract, "part of which was formerly under, but is now above the tidewaters of the Arthur's Kill or Staten Island sound." The shore line is described as "the original high-water mark on the westerly shore of said sound," and "the original high-water mark on the northerly shore of the Elizabeth river," and the grant conveys, by metes and bounds, a tract beyond these original shore lines of the sound and river to the exterior wharf line fixed by the commissioners under the riparian acts. The grant expressly conveyed "all the rights of the state in said lands."

The attorney-general, as informant, and the city of Elizabeth allege that, from time immemorial, a common highway

has existed across the state from the Delaware river, at Trenton, and across this ninth tract, to a point on Staten Island sound in the city of Elizabeth, connecting with the navigable waters of the sound at the original high-water mark of the sound, which highway is now known as Elizabeth avenue; that at the time of this grant the highway extended across this ninth tract to the shore line, as it then existed, over land which had been filled in beyond the original high-water mark; that the grant of the *ninth* tract extended along the shore line of the sound (measured on the exterior wharf line) for about five hundred feet and included the lands under water in front of the highway, and also the lands included within the lines of the highway lying below the original high-water mark of the sound. The highway is alleged to be ninety-four feet wide. They now apply to set aside this grant of the ninth tract, so far as it conveys, or purports to convey, any portion of the lands included within the lines of this highway below the original high-water mark, and for two reasons: The first is that the grant was made to the Central railroad company, not as riparian owners, but with the consent and at the request, in writing, of the Elizabethport and New York Ferry Company, and that neither the railroad nor the ferry company were riparian owners of the lands included within the lines of the common highway. It is therefore claimed that under the riparian acts the grant was *ultra vires* and void as to lands under water in front of the highway. The second reason is that, in making application, in writing, to the commissioners for a grant of this land, as required by the riparian acts, the railroad company gave a description of the ninth tract in their application, and that annexed to the part of the application containing the description was a map or diagram, purporting to display the tract and the location of the highway in question in relation thereto, according to which Elizabeth avenue terminated at a point about three hundred feet inland from the shore and at the intersection of the avenue with South Front street, a street running in the same general direction as the original shore line referred to in the map, and about three hundred feet distant from the shore line at that point. The information and bill allege that no other or further

information was submitted to the governor and commissioners as to the boundaries of the tract or the location and termination of this common highway than that contained in the application, being the description and map, and that the governor and commissioners, relying on these statements and information, made the grant. It is then alleged that the statements of the application, together with the representation of the highway on the map, were intended to mislead, and did mislead, the commissioners and governor, and that at the time of the application the highway, Elizabeth avenue, extended to the sound, the lines thereof being continued across and beyond South Front street to the sound. It is therefore claimed that the grant as to so much of it as included lands within the lines of, or in front of, the highway was obtained by false suggestion and untrue statements, and is void. The city of Elizabeth claims that it has the right to the possession of the lands included within the limits of Elizabeth avenue extended from First street to the exterior wharf lines. For that portion of these lands thus included in the highway, which are in the possession of the railroad, being the portion beginning about one hundred and sixty-eight feet from the southerly side of Front street and extending to the exterior wharf line, the city, in 1888, brought an action of ejectment against the railroad company in the Union circuit court. It appears by the record and proceedings in that suit, which have been put in evidence on this hearing, that at the trial of this action in September, 1889, certain questions of fact were left to the jury. These were—*first,* whether the old highway, now known as Elizabeth avenue, ran to the waters of the sound, or terminated as the railroad company claimed at a point some distance therefrom, and near what is now South Front street; and if the avenue ran to the shore, then, *second,* whether it ran over the *locus in quo,* that is, between the lines of the avenue extended from Front street in straight lines to the shore, or whether, from about Front street, it curved and ran to the shore northerly and outside of these lines and outside of the tract claimed in the suit. It appeared on this trial, and by evidence, which, as the judge charged the jury, could not be doubted, that from the year 1849 the railroad com-

pany, and those from whom it derived title, had possession of this disputed piece of land included in the ejectment suit as part of a dock or wharf, and that during all that time they had been in full possession, excluding the ·public. He further charged the jury that if the highway existed, the public right could not be taken away by adverse possession or user, and as to the effect of the grant now in question upon the public right in the highway, directed the jury that under the decision of the court of errors and appeals (in 1873) in *Hoboken Land and Improvement Co.* v. *Hoboken, 36 N. J. Law* (*7 Vr.*) *540,* made before the grant, the public right of highway was not affected by the riparian grant, and that the lands conveyed were still subject to the public right of highway. Upon a rule to show cause the case was certified to the supreme court for its advisory opinion, which was reported in *Elizabeth* v. *Central Railroad Co., 53 N. J. Law* (*24 Vr.*) *491* (*1891*). The question whether the highway extended to the waters of the sound or terminated at or near a place called the Point House, several hundred feet inland, depended mainly upon the construction of a colonial statute relating to the highway, passed June 20th, 1765, and the supreme court, construing this act, held that the highway extended to the waters of the sound, and did not, after the act, or by reason thereof, terminate at the Point House, as the railroad company claimed. On the question whether the highway thus extended to the shore was continued in a straight line so located as to include the *locus in quo,* the court held that the case was properly submitted to the jury upon the evidence, and that there was no just ground to complain of their verdict in favor of the plaintiff that it did so continue. The principal legal question raised related to the ·effect of the riparian grant upon the public right to a highway over the lands included within the grant. As to this the supreme court, construing the riparian acts, under which the grant was made, held (1) that the grant was made to the railroad company under the authority of the riparian act of March 31st, 1869 (*3 Gen. Stat. p. 2786*), and the supplements to March 27th, 1874 (*3 Gen. Stat. pp. 2784–2798*), including an act of April 6th, 1871, relative to the riparian commission, and that the grant made under

these supplements conveyed all the right of the state in the lands described in the grant, and had the same effect as if made directly under the act of March 31st, 1869. As to the effect of a grant under this latter act, the court held (2) that the effect of such a grant was to convey the lands described to the grantees for their exclusive use for the purposes expressed in .the grant, and to exclude every right of use or occupancy on the part of the public, and that in face of such grants highways running to the original water line would not be continued to the water line formed by filling in the granted area. *Elizabeth* v. *Central Railroad Co., 53 N. J. Law (24 Vr.) 494 (1891).* In relation to such highways, the rights of grantees under the riparian grants were considered to be different from the rights given by legislative acts of the character considered in the *Hoboken Case, supra.* It was held that under the acts construed in the *Hoboken Case,* a mere license to fill in or reclaim undefined land under water was granted to a riparian owner and that, under such license, the licensee could acquire against the state no greater rights in the land reclaimed than he had in the *ripa.* *53 N. J. Law (24 Vr.) 495.* As to the applicability of the previous decision in the *Hoboken Case,* the court took the same view as had been taken by the supreme court of the United States in *Hoboken* v. *Pennsylvania Railroad Co., 124 U. S. 656, 691 (1887),* that the decision did not control the case and considered itself free to determine the effect of the grants under the riparian acts. In deciding the question of the effect of these grants, the court, however, felt constrained to follow the federal decision on the same point out of regard for uniformity of decision on a question affecting so many important titles in the hands of citizens of other states as well as our own. *53 N. J. Law (24 Vr.) 495, 496.* Reaching thus the conclusion that the railroad company had title under the grant to so much of the *locus in quo* as was located below the original high-water line, it advised the circuit court that the verdict be set aside and that a new trial be granted. Upon the argument of the rule it had been insisted, upon the part of the city, that neither the railroad company nor the ferry company, with whose consent the grant was made, were riparian owners, and that the

grant was therefore ineffective, but upon this point the court decided (see *pp. 495, 496*) that under the act of April 6th, 1871 (*3 Gen. Stat. p. 2796*), the commissioners were authorized to make to any applicant grants of lands lying between original high-water line and the exterior lines on the same conditions, for the protection of riparian owners, as the act of 1869 prescribed (six months' notice of the application and failure to apply), and that under the supplement of March 27th, 1874 (*3 Gen. Stat. p. 2791*), the commissioners were authorized to fix the purchase-money to be paid by any applicant for lands below high-water mark or formerly under tidewater, and to grant the lands to such applicant whether riparian owner or not. They therefore held that the grant now in question was authorized under the riparian laws. Whether this conclusion was reached upon the ground that the grant could be made under the act of March 27th, 1874, to any applicant whether riparian owner or not, or upon the ground that the consent of the ferry company, the riparian owner, was sufficient under the act of April 6th, 1871, does not seem to be expressly stated in the opinion. Chief-Justice Depue, in *Ocean City Association* v. *Shriver,* '64 *N. J. Law* (*35 Vr.*) *550, 565* (*Court of Errors and Appeals, 1900*), said that the act of March 27th, 1874, seemed to empower the riparian commissioners to make grants of lands under water to any applicant, but neither the act of April 6th, 1871, nor of March 27th, 1874, was involved in the grant in that case, which was made under the act of March 21st, 1871 (*3 Gen. Stat. p. 2790*), authorizing grants to riparian owners only. Upon the argument of the rule it was also urged, in behalf of the city, that on the application for the grant the railroad company submitted to the commissioners a map exhibiting an erroneous view of the road in dispute, and that the commissioners were thereby deceived in making the grant, and that the grant, being obtained by false suggestion, was void. The court held that, without mentioning other considerations which might prevent the application of the principle to the case, yet, inasmuch as the false suggestion did not appear on the face of the grant, it could not be deemed void in collateral proceedings (at *p. 496*). The information and bill in this suit set out the proceedings

in this suit at law and allege that, in pursuance of the advisory opinion of the supreme court, the verdict has been set aside and a new trial ordered, and that it is the intention of the railroad company, on the coming trial of the cause, to offer the grant in evidence and rely on it as a defence to the action, and to claim title to and right of possession of the common highway included in the *locus in quo* by reason thereof. They therefore pray that the grant may be declared void so far as it purports to convey the lands within the highway or under water in front thereof; that a declaration be made that the company have no estate or title or right of possession to the highway by virtue of the grant; that the grant may be corrected and reformed, and that the company may be enjoined from offering the grant in evidence in the ejectment suit or making a defence thereto by means thereof. This statement of some of the points raised and decided in the supreme court in the action brought by the complainant is necessary, because on the hearing before me these same questions are presented by the informant and complainant as now before this court for decision in this suit. Other questions of a purely legal character and being questions which, as between the city of Elizabeth and the defendants, could be decided in the action at law, are also presented on this hearing, and a decision thereon by this court is now sought by the attorney-general and complainant. On the part of the defendants it is claimed that the decision of the supreme court in the action of the city upon the questions there decided cannot be reviewed or questioned in this proceeding, and also that, as to any additional questions now raised, which are of a legal rather than an equitable character, the defendants are entitled to the judgment of a court of law in the ejectment suit, and this court should not undertake to decide these legal questions in these proceedings either upon the information or the bill. The attorney-general was not a party to the ejectment suit, and could not have been, and the preliminary question in this cause is, how far the attorney-general, as representing the state on this information, is bound by the decision of the supreme court in the city suit as settling the law of the case or otherwise, and whether a decree on the information in this cause, as well as upon the

bill, must be merely auxiliary to the pending action at law and limited to questions which could not have been tried in the ejectment suit or cannot be hereafter tried there. As to separate decrees on an information and bill, it is settled that the dismissal of a bill filed in connection with an information does not necessarily carry the information with it, and that the attorney-general, if the information shows a right to relief, may have a decree. *1 Dan. Ch. Pr. (6th ed.) *11*, citing *Attorney-General* v. *Cockermouth Local Board, L. R. 18 Eq. Cas. 172; Grey, Attorney-General,* v. *Greenville and Hudson Railroad Co., 59 N. J. Eq. (14 Dick.) 372,* and cases cited at *p. 378 (1900).* In this latter case an information and bill were filed; the bill was dismissed on demurrer to both information and bill, but the information was retained and a preliminary injunction was ordered thereon. On appeal from this order it was held that the injunction was properly ordered. *62 N. J. Eq. (17 Dick.) 768, 772 (1900).* But the point now under inquiry was not specially referred to. The *Greenville and Hudson Railroad Co. Case* was one where the defendants were building their railroad over a public highway, and the attorney-general, in right of the public, claimed that the construction of the road on this location was in excess of the corporate powers of the company, and it was held by the court below, and expressly affirmed on appeal, that without regard to the question of the extent of the interference and independent of the question of nuisance, the attorney-general was entitled to restrain in equity the excessive use of corporate powers, if the company had no right to build the road across the highway. *59 N. J. Eq. (14 Dick.) 373, 386, &c.;* on appeal, *62 N. J. Eq. (17 Dick.) 772.* There was not, as in the present case, an issue as to whether the highway in fact existed, but an issue of the excessive use of corporate powers to the impairment in any degree of the public right of highway. In *Attorney-General* v. *Cockermouth Local Board, supra,* the information was also retained and decree granted on the jurisdiction to restrain excessive use of powers by the corporation in discharging sewage into a stream, while the bill, which was filed by the relator, alleging a nuisance from the sewage, was dismissed, because the nuisance was not proved.

Informations of this class, filed by the attorney-general to restrain excessive use of powers, in connection with bills filed for relief against the same acts as infringing private rights for other reasons, are not strictly analogous to cases like the present, where the public right which the attorney-general as well as the complainant seeks ultimately to protect, and the public injury is the same. The attorney-general is, of course, the only officer on whose application a grant of the state affecting, or claimed to affect the right, of highway could be questioned or restrained in its operation, but the grant in this case is questioned solely because it affects the right of highway claimed, and the operation of it is sought to be restrained only so far as it affects the public right of highway. That the informant and the complainant can be joined has been already decided on a demurrer to the information and bill, which was overruled by the chancellor. *Attorney-General* v. *Central Railroad Co., 61 N. J. Eq. (16 Dick.) 259 (1901).*

In a case of this kind, where a suit at law is pending between the complainant and defendant, for the final settlement of the question of the existence of the public highway, the general rule to be applied is that the relief on the information, as well as on the bill, should only be auxiliary to the suit at law, and that the attorney-general should not here question or review the rulings of the court of law upon the legal question already decided in the action at law, or upon questions of a legal character which may be thereafter decided there. In other words, the information should not be used by the attorney-general, in this case, as a method of reviewing in this court the decision of the law court in the case of the city. In deciding the issues in this case I shall, therefore, consider the information as well as the bill as merely auxiliary to the action at law pending. The issues of fact and law made by the pleadings in this cause are these:

(1) The existence or non-existence of a public highway over the *locus in quo* prior to the riparian grant.

(2) Whether the grant was *ultra vires,* on the ground that neither the railroad company nor the ferry company were riparian owners of the lands included within the lines of the highway.

(3) Whether under the riparian acts the grant operated to prevent the existence of the highway over all of the lands included in the grant below the former ordinary high-water mark.

(4) Whether the grant was obtained by fraud or false suggestion.

(5) Whether the right to any equitable relief is barred by delay in bringing suit.

As between the city and the railroad company, the first of these questions—highway or no highway—having been once decided in favor of the city, is now in the course of final adjudication in the action at law. It is a question properly triable in the action at law, and so long as the action at law for the trial of that issue is pending, this court should not, either on the information or on the bill, decide this issue, but should confine itself to such equitable relief as the informant or complainant may be entitled to in order to have the issue tried at law. On that view of the scope of relief, and for the purposes of this suit, it must now be assumed, as to this issue, that in the action at law the existence of the highway over the *locus in quo* prior to the grant may be satisfactorily made out and that the highway existed as claimed in the information and bill.

The second question, whether the grant was *ultra vires,* on the ground that neither the railroad company nor the ferry company were riparian owners of the lands included within the lines of the highway, as claimed, was also an issue in the action at law and is now as between the city and the defendant, an issue to be finally determined there. The decision of the question involves the determination—*first,* of the question of fact as to the record or paper title of the ferry company to the *ripa* and reclaimed lands, and *second,* of the question of law as to the power of the commissioners under the riparian acts to make the grant to the railroad company with the consent of the ferry company. On the rule to show cause both these questions were resolved in favor of the grant. On the new trial the same issue will remain to be again decided, and this court should not now, on the application of the city, undertake to decide this question, but should, for the purposes of this suit and on the information as well as on the bill, assume that this issue, so far as it involves a matter of fact,

may be decided in favor of the defendant, and so far as it involves a question of law that it must, on the new trial, be decided in their favor, as being the law of the case, established between the parties for the purpose of the new trial.

The third issue, whether under the riparian acts the grant operated to prevent or terminate the existence of the highway over the lands included in the grant below the line of the original high-water mark, was purely a question of law as to the construction of the riparian acts, applied to the facts proved in reference to the situation of the lands at the time of the grant. In the action at law it was decided in favor of the railroad company, and so far as the city is concerned, this decision upon a matter of law settles the law of the case for the purpose of the new trial, and also in this suit, brought to aid the future trial of the action. As to the attorney-general, the decision must be considered as one made by the court of law upon a question purely legal and should be followed in this court, leaving the review of the decision to the appellate court. But while following the decision, and as to the informant as well as the complainant, it is proper that I should call attention to an aspect of the case as now presented on this third issue, which does not seem to me to have been specially presented to or decided by the supreme court, but which is presented on the whole record. In deciding upon the effect of the riparian grant, the supreme court, as I read the opinion, gave it operation as conveying all the lands between the original high-water mark and the exterior wharf line fixed by the commissioners, as being then lands of the state conveyed by the grant. The *ratio decidendi* of the decision (at *p. 495*) was that the claimant (under a riparian act grant) was the grantee of all the rights of the state in specified lands under water, founding its title upon express words of conveyance, the reasonable force of which excluded the reservation which would be implied against a licensee under a mere license to fill in and enjoy undefined land. Such license is subject to the implied limitation that the licensee should acquire against the state no greater rights in the land reclaimed than he had in the *ripa* in front of which the reclamation is made, and a public right of access to the water is not extinguished by filling up under the license. The de-

14

cision . throughout seems to proceed on the basis that at the time of the grant the state was the owner of all the lands included in the grant below original high-water mark, and no reference was specially made in the opinion to a fact which appears in the evidence and which may materially change the aspect of the case and the effect of the grant as to so much of the land within the lines of the highway as was located between original high-water mark and original low-water mark. It appears by the uncontradicted evidence, and it was the opinion of the supreme court (at *p. 495*) that the ferry company, or its predecessors in title, were owners of the original *ripa,* and it appears by undisputed evidence that the riparian owners had filled up the lands below original high-water mark and at least as far as the original low-water mark, and had built wharves and a dock on this original shore. This reclamation was made before the passage of the Wharf act of 1851, the first section of which provides:

"That it shall be lawful for the owner of lands, situate along or upon tidewaters, to build docks or wharves upon the shore in front of his lands, and in any other way to improve the same, and when so built upon or improved to appropriate the same to his own exclusive use." *3 Gen. Stat. p. 3753.*

By the eleventh section of this act, "shore" was defined to be the lands between the limits of ordinary high and low water. By force of our local common law and these provisions of the Wharf act of 1851, the land between high and low-water mark reclaimed by the shore owner became vested in the shore owner as his lands. *Stevens* v. *Paterson and Newark Railroad Co., 34 N. J. Law (5 Vr.) 532, 549 (Court of Errors and Appeals, 1870)* ; *American Dock and Improvement Co.* v. *Trustees Public Schools, 39 N. J. Eq. (12 Stew.) 409 (1885).* In the latter case Mr. Justice Depue, charging the jury at law on an issue sent from this court, said that the title of the riparian owners to lands above low water reclaimed under the Wharf act was indefeasible, and he directed the jury that this title was good against a subsequent grant of the state to another person covering lands above low water thus reclaimed (at *pp. 424, 437*). Chancellor Runyon, in the same cause, on application for new trial, also said (at

*p. 445*) that a riparian owner, who had reclaimed the shore in front of his lands under the Wharf act (1851) and before its repeal, had legal title to the land reclaimed against a subsequent grantee of the state. This legal title of the shore owner to the lands between high and low-water mark reclaimed either before or after the act of 1851, was subject, however, to the easement of a public highway reaching to high-water mark before the reclamation. *Newark Lime and Cement Co.* v. *Newark, 15 N. J. Eq.* (*2 McCart.*) *64, 69, Chancellor Green* (*1862*), approved in *Hoboken Land and Improvement Co.* v. *Hoboken, 36 N. J. Law* (*7 Vr.*) *540, 547* (*Court of Errors and Appeals, 1873*). At the time of the application for the grant now in question, November, 1874, it would seem, therefore, that the state had no title whatever to so much of the lands in question included in the grant as were above original low-water mark and had been reclaimed, and that the public right of highway (assuming, as I now must, that the highway ran in the lines claimed to the original high-water mark) existed over the reclaimed land as far at least as the original low-water line, and that the only power or authority which the state had over these reclaimed lands belonging to other owners was by virtue of its sovereign right over highways. The question, then, is whether, under the riparian acts, the commissioners had the power of releasing the public right of highway over the private owners' lands by a grant under the riparian acts, conveying these reclaimed lands of the owner to himself or to his nominee, as lands of the state, or by conveying to the grantee all the rights of the state in the reclaimed lands above low water belonging to another than the grantee. Upon examination, the riparian acts do not seem to warrant this construction of the grants. The act under which this grant of the ninth tract was made was the supplement of March 27th, 1874, by virtue of which the riparian commissioners (four in number), or any three of them, together with the governor, were authorized to fix the price or rental and to make grants or leases. Under the previous acts grants were required to be made by the commissioners (or any two of them) with the concurrence of the governor and attorney-general. *Act March 31st, 1869; section 4.* The attorney-general did not join in this

grant, and it can have effect only under the act of March 27th, 1874. This supplement of March 27th, 1874 (*P. L. of 1874 p. 103; 3 Gen. Stat. p. 2791 § 26*), authorized

"the riparian commissioners, or any three of them therein concurring, together with the governor of this state, to fix and determine, within the limits prescribed by law, the price or purchase-money, or annual rental to be paid by any applicant for so much of lands below high-water mark, or lands formerly under tidewater belonging to this state, as may be described in any application therefor, duly made according to law; and the said commissioners, or any three of them therein acting and concurring, with the approval of the governor, shall, in the name and under the great seal of the state, grant or lease said lands to such applicant accordingly."

The supreme court, in the *Elizabeth Case, 53 N. J. Law (24 Vr.) 497*, held that this act authorized a grant of lands to any applicant, whether riparian owner or not, but it will be observed that this act, in its terms, authorized a grant only of lands *belonging to the state,* then or formerly under tidewater, and extended to no other lands than those owned by the state. In all the previous *Riparian acts,* up to the act of April 6th, 1871, the same limitation is made, either expressly or by clear implication. Previous to the act of April 6th, 1871 (*P. L. of 1871 p. 113; 3 Gen. Stat. p. 2796*), entitled "An act relative to the riparian commission," the right of the riparian commissioners to make any grants or leases of lands of the state not under tidewater seems to have been doubted, and by that act, for the purpose, as recited in the preamble, "of quieting the possession of those who apply to the commission for grants or leases of land which were heretofore but are not now under tidewater," the commissioners (among other things), on applications for leases or grants of lands not under tidewater, were authorized "to grant or lease such lands, or any part thereof, lying between what was at any time heretofore the original high-water line and the exterior lines to be established." The grants of lands below original tidewater, under this act, may have been intended to quiet the possession and complete the title of lands which had been reclaimed without authority of the state, and as to which the state had or might claim to have proprietary rights, and as between the state and the riparian owner who had reclaimed or

his successor in title the grant (if made to them) would perfect the title and quiet possession as to the state's proprietary or sovereign rights. But a grant by the state to an applicant not the riparian owner, under this act, of lands to which the riparian owner had undisputed title by reclamation previously made by the authority of the state, would seem to be, under the cases above cited, inoperative as a grant of lands, and the question is whether it operated as a vacation, by necessary implication, of an existing public right of highway over the lands of the riparian owner. The general rule on this subject is stated by Chief-Justice Whelpley, in *Warren Railroad Co.* ads. *State, 29 N. J. Law (5 Dutch.) 353 (Supreme Court, 1862)*: "Public highways ought not to be destroyed, even in part, under pretence of legislative authority, unless it be conferred either in express terms or by necessary implication. If the words are ambiguous, the construction ought to be in favor of the common right of highway, and not against it." Other cases applying the principle of strict construction to legislative grants under which authority to interfere with highways was claimed, and denying the right claimed, are *Jersey City* v. *Central Railroad Co., 40 N. J. Eq. (13 Stew.) 417 (Vice-Chancellor Van Fleet, 1885)*; *Lehigh Valley Railroad Co.* v. *Orange Water Co., 42 N. J. Eq. (15 Stew.) 205 (Vice-Chancellor Van Fleet, 1886)*; *Township of Raritan* v. *Port Reading Railroad Co., 49 N. J. Eq. (4 Dick.) 11, 13 (Chancellor McGill, 1890)*. If this question were now open for me to decide, as one not within the decision of the supreme court, I should be inclined to hold that the grant of the ninth tract must be held to be ineffective, so far as it purported to convey any public right of highway on land of the riparian owner between the original high and low-water mark which had been reclaimed before the passage of the Riparian acts, or to convey or release any public right of highway on such reclaimed land. It was operative as to the highway on lands below the original low-water mark, even if reclaimed, because no authority for such reclamation has been shown, and in the absence of any authority from the state the lands below low water belonged to the state, although reclaimed, and therefore all rights of the state passed by the grant. But this question as

to the effect of the grant is altogether a legal question, arising on applying the terms of the grant to the subject-matter under the proofs' in the case, and as between the city and the defendants the validity of the grant, as excluding any public right of highway on all of the lands below original high-water mark, has been decided in favor of the railroad company. The city is bound by that decision as the law of this case for the purposes of the new trial, and its remedy against such construction, if it has any, must solely be by review in the law courts. I think, also, that as to the attorney-general this must be the procedure for review of the decision of the supreme court. In a case decided by Vice-Chancellor Pitney before the submission of this case, but not then officially reported and not referred to by counsel, this same question as to the applicability of the decision in the *Elizabeth Case* to the highway over lands reclaimed at the time of the grant was expressly raised. *Morris and Essex Railroad Co.* v. *Jersey City, 63 N. J. Eq.* (*18 Dick.*) *45* (*April 23d, 1902*). Vice-Chancellor Pitney differs from me in reference to the scope of the decision of the supreme court, and thinks the court did expressly have in view this grant of the sovereign rights over the reclaimed lands upon which highways existed (at *p. 51*). The portion of the supreme court's opinion which he considered as expressly deciding on the point is the clause at the conclusion of the opinion (*53 N. J. Law* (*24 Vr.*) *497*, in which the learned justice says that "the grant is made in absolute terms, *independent of any riparian title,* and without reference to any particular statute," &c. Vice-Chancellor Pitney reads this reference to riparian title as meaning "independent of any riparian title *of the state,*" and as referring to its rights of sovereignty over the lands specified. The opinion shows that the point then under consideration and upon which this view was expressed was the objection that a riparian title *in the grantee* was necessary to the validity of a grant by the state—and, I take it, that the phrase meant that the grant was valid independent of any riparian rights *in the grantee,* not independent of any proprietary rights of the state. But Vice-Chancellor Pitney's view may be the correct one. In the case before him Vice-Chancellor Pitney decided that upon the

evidence in the case there was no highway over the reclaimed lands at the time of the riparian grant, and also that under the decision of the supreme court, and according to his own view, also, of the decision of the United States supreme court, the grant operated to release the right of public highway on the reclaimed lands if it existed at the time of the grant. His decree was formally affirmed by a vote of the court of errors and appeals, but no opinion has been filed nor· *remittitur* entered. An application for rehearing is now pending before that court. The whole question, therefore, of the scope of the decision of the' supreme court in the *Elizabeth Case* may now be under review in the appellate tribunal, but for the purposes of this hearing the decision of the supreme court that the grant operated to extinguish the public right of highway over all the lands specified in the grant is conclusive as to the complainant and controlling as to the attorney-general.

Treating the grant, then, as vacating the highway over all the lands described in the grant of the *ninth* tract, the remaining issue is whether the grant of this tract or of the rights of the state in it, or in the part claimed to be covered by the highway, was obtained by fraud or false suggestion. Under the Riparian acts in force at the time of the grant in question, grants of land were made upon application of the riparian owner or applicant to the commissioners, upon which application the commissioners designated the lands and fixed the price or rental. They were required to make a certificate of the boundaries, the price, compensation and rentals under their hands, to be filed with the secretary of state. On payment to the state treasurer of the compensation fixed the commissioners, in the name of the state and under the great seal of the state, granted the lands. *Act of March 31st, 1869, section 8; 3 Gen. Stat. p. 2788 § 15.* The act of April 6th, 1871, entitled "An act relative to riparian commission" (*3 Gen. Stat. p. 2796*), which expressly authorized applications for grants or leases of lands "which were not at the time of the application under tidewater, and authorized the grant of such lands, or any part thereof, lying between what was at any time heretofore the original high-water line and the exterior lines established or to

be established," provided "that the commissioners should grant or lease in all cases in which in their discretion they shall think such grant or lease should be made, such rights, privileges and franchises as they are authorized to grant in cases coming directly within the fourth section (of the act of 1869), with the covenants provided by that act, and should insert such other covenants, clauses and conditions in said grants or leases as they shall think proper to require from the grantee or lessee, or ought to be made by the state." And it was further provided that the applications and certificates in the cases thus provided for might vary from the provisions of the supplement (of 1869) so as to conform to the act. The supplement of March 27th, 1874 (*P. L. of 1874 p. 103; 3 Gen. Stat. p. 2791 § 26*), provided for grants "to any applicant for so much of lands below high-water mark or lands formerly under tidewater belonging to this state as may be described in any application therefor, duly made according to law." And the commissioners were authorized, in the name and under the great seal of the state, to "grant or lease such lands to such applicant accordingly." The written application in this case, made by the Central Railroad Company of New Jersey to the commissioners, dated November 6th, 1874, set out

"that the applicants are the owners of land in the counties of Hudson, Union, Essex and Middlesex, in the State of New Jersey, fronting on water where the tide ebbs and flows, and so are riparian owners in the tidewaters of this state, and are also, by the written consent and contracts in writing of other riparian owners, invested with the rights of riparian owners as to their lands under tidewater, and while claiming the ownership are nevertheless desirous of obtaining a grant from the said state of the lands under water which lie in front of said lands hereinafter described, to wit :"

Then follows the description of the several tracts, the one in question being as follows :

"*Ninth Tract.*—Being in the city of Elizabeth, in the county of Union and State of New Jersey, beginning at a point where the southeasterly extension of the centre line of Marshall street, in the city of Elizabeth, intersects the former ordinary high-water mark in the northerly shore of Staten Island sound; thence southerly and southwesterly in said high-water mark, along the sound and up Elizabeth creek to South Front street; thence northerly and easterly, along the boundary lines of the Elizabethport and New York Ferry Company to the place of beginning."

The commissioners were requested to designate what lands under water lie in front of said lands owned by and vested as to riparian rights in said applicants within the exterior wharf lines, "and to fix the price and reasonable compensation for the grant of so much of said land under water as lie below high-water mark and may properly be included in the grant," and to certify the boundaries and the price and compensation to be paid. Annexed to the original application (which by consent of the parties I have examined in the office of the secretary of state) were maps of all the tracts. This map of the ninth tract was identical with the map annexed to the information and bill as Schedule A, except that it does not show any exterior wharf lines or any lines outside of the line intended, apparently, to indicate a shore line of some kind.

On this map no lines were designated or marked as being the line of either existing or original high-water mark, or as property lines of the ferry company; neither were any points fixed on the map, inasmuch as the only two points which were re-. ferred to in the description were said to be in the original high-water mark. The map, although in fact annexed to the application, was not referred to in the application as so annexed. Upon this application the commissioners made a certificate of boundaries, which was annexed to the application and maps, and after formally reciting that it was made "in compliance with the above application," designated as the *ninth tract:*

"All that tract of land in the city of Elizabeth, in the county of Union and State of New Jersey, part of which was formerly under, but is now above, the tidewaters of the Arthur kill or Staten Island sound, and part of which is still under the tidewaters of said sound, described as follows: Beginning at the original high-water mark on the westerly shore of said sound, at a point in line with the centre line of Marshall street, extended southeasterly and from thence running south twenty-eight degrees and twenty-five minutes east, to the exterior wharf line established by the commissioners appointed under the authority of the Riparian act of 1864 and the supplements (said exterior wharf line being at a distance of two hundred and twenty-two feet and three-tenths of a foot from the south-easterly line of Front street, measured in the centre line of Marshall street) ; thence along said exterior wharf line [six courses, specified by courses and distances, the last two courses above mentioned lying along the Elizabeth river] to the original high-water mark on the northerly shore of the Elizabeth river, and northeasterly along the original high-

water mark of the Arthur kill or Staten Island sound to the place of beginning, and likewise any and all lands lying in front of that above described to any point or points to which the said exterior wharf line may hereafter be legally extended."

The commissioners certified the boundaries of all the twelve tracts and fixed the price of $300,000 as the entire price or compensation, upon paying which a conveyance for said lands should be made. Attached to the certificate of boundaries were maps of the several tracts, the map of the ninth tract being one which was identical with the map annexed to the information and bill as Schedule A. In addition to the lines marked on the map accompanying the original application, this map attached to the certificate of boundaries contained, marked in red, the exterior wharf lines, and also, in red, a line about seventy-five feet in length on the northern boundary of the tract, and being an extension of the centre line of Marshall street, beyond the line marked as a shore line out to the exterior wharf line.

The formal grant by the governor and commissioners, which was dated November 12th, 1874, recited the application, as above, the payment of the price fixed, and conveyed all of the tracts, including the *ninth* tract, by the same description as in the certificate of boundaries, "together with all and singular the hereditaments and appurtenances hereunto belonging and all the rights of the said state in said lands." No maps were referred to in the grant, nor, apparently, were any maps annexed to the grant. The Riparian act authorizing the insertion of this clause conveying all the rights of the state was the supplement of March 21st, 1871 (*3 Gen. Stat. p. 2790*), which directed that a grant or lease to a riparian owner of lands under water in front of his lands "shall vest all the rights of the state in said lands in said lessee or grantee." The grants under the act of April 6th, 1871 (*3 Gen. Stat. p. 2796*), authorized the grant of such rights as were authorized under the fourth section of the act of 1869 (*3 Gen. Stat. p. 2787 § 11*), which was that the grant or lease should pass "not merely the title to the lands therein described, but the right to fill up to the exterior bulk-head lines and appropriate the land to exclusive private uses." The supplement of March 27th, 1874 (*3 Gen. Stat. p. 2791 § 26*),

authorized the grant or lease of lands under tidewater or formerly under tidewater belonging to the state, but did not declare in terms the effect of the grant, and did not expressly authorize the conveyance of all the rights of the state.

The information and bill charge that the map or diagram annexed to the application purported to display the *ninth* tract and the location of the highway in relation thereto; that no other or further information was submitted to the governor and commissioners as to the boundaries of said tract or the location and terminus of the highway than the information contained in the application, being the description and map, and that, on November 12th, 1874, the governor and commissioners, in pursuance of and relying on the statements and information contained in the application, executed the grant of the ninth tract by the description above set out. It is charged that the statements in the application, together with the representation on the map, that the railroad company was the riparian owner of so much of the ninth tract as lay between the lines of the highway, were false and intended to mislead and deceive the commissioners and governor; that at the time of the application the highway extended to the sound and ran between two tracts owned by the ferry company, and that so much of said grant as purported to convey to the railroad company the lands or any interest in the lands between the lines of the highway and below original high-water mark thereon was obtained by means of said false suggestion and untrue statements in the application and is illegal and void. The governor and all the commissioners who signed the grant are deceased, and the only evidence outside of the papers themselves relating to representations to the commissioners relating to the lands or highway upon which the claim of false suggestion is based, is the evidence of a Mr. Jacob M. Clark, a civil engineer or surveyor. He said, in the ejectment suit (at *p. 185, &c.*), that, acting for the Central Railroad Company, he prepared a map, showing the wharf lines as he surveyed them as they then stood, for the commissioners for their information; that this map was with the grant, and he identified a map shown him on the trial (and marked either *D 37* or *D 38*) as the map referred to. On cross-examination, in refer-

ence to this map, he says (at *p. 234*) that this was one of two original diagrams he made for the benefit of the commissioners; that he thinks he made two just alike; that the one shown him on the trial came back with the grant among the papers; that these were made in connection with the application and for the purpose of informing the riparian commissioners what they needed—the general situation of "our" property—so they could make the grant, and informing them also what the shape of the wharf land was as it then existed. In answer to questions as to the map being a correct representation of the foot of Elizabeth avenue, and whether that avenue did not, as he then (at the time of the trial—1889) understood, go down one hundred and sixty-eight feet east of Front street, and whether the map was not therefore erroneous, he says that it was not erroneous for the purpose of the diagram; that the information to the commissioners was the location and situation of "our" property, its shape, &c., and that it was not his business to locate the streets, and that if Elizabeth avenue did in fact run one hundred and sixty-eight feet southeast of Front street, the avenue was not correctly shown on the map. On the hearing before me a map, marked *Exhibit D 37* and supposed to be the map identified by Mr. Clark on the trial as made by him, was produced. Mr. Clark was then deceased, and two witnesses, familiar with the handwriting of Mr. Bacot, the secretary of the riparian commissioners at the time, say that the map produced before me at the hearing was in Mr. Bacot's handwriting. This map has been mislaid since the hearing and was not sent in with the exhibits, but my recollection is that it was a map identical with the map attached to the certificate of boundaries and with the map, Schedule A, attached to the information, *i. e.,* a map which, in addition to a shore line, showed the exterior wharf line boundaries. In other respects, and as to location and termination of Elizabeth avenue at South Front street, it was the same as the map annexed to the original application on file. Except for the purpose of making this survey of the property, Mr. Clark does not appear to have been in the employ of the railroad company, or to have had any knowledge of the property or highway, except as they actually existed on the ground. He does not appear to

have prepared the description in the original application or in the certificate of boundaries. The application was the act of the company, and the purpose of this application, on the face of it, was to describe or designate the tract of land *in front of which* a riparian grant was desired, and the application, as to this ninth tract, says in terms that the company, being invested with the consent of the riparian owner (the ferry company) as to its lands under tidewater, is desirous of obtaining a grant from the state of the lands under water *which lie in front* of the lands described. This was a tract which was included between the line (toward the shore) of the former ordinary high-water mark of Staten Island sound and Elizabeth creek (extending between the centre line of Marshall street and South Front street) and the line (toward the upland) of the boundary lines of the ferry company, running northerly and easterly between these two points in former ordinary high-water mark. This described a tract in front of which the grant is desired, but it does not designate on the map, or by the description or map, where the high-water mark is. The commissioners, by the original Riparian act of April 11th, 1864 (*3 Gen. Stat. p. 2785 § 1*), were directed to make and submit maps "showing the original shore line as far as the same can be ascertained," and by the twelfth section of the act of 1869 (*3 Gen. Stat. p. 2789 § 19*) were authorized to proceed by ejectment or otherwise against persons and corporations trespassing upon or occupying the lands of the state under water, or which were heretofore under water. No map seems ever to have been filed by the commissioners locating original high-water mark at the place in question, and the only evidence in this case as to the location of original high-water mark is the evidence of Mr. Clark, who, in 1889, before the trial of the ejectment suit, located, or attempted to locate, this line by borings through the filled reclaimed land down to the salt meadows and the salt mud beyond it. According to the map constructed by him from the information supplied by the shore borings, the original high-water mark at its intersection with the centre line of Marshall street extended, (the beginning point of the riparian grant), was about seventy-five feet from the exterior wharf line, as described in the grant. Opposite Elizabeth avenue, if ex-

tended in straight lines to the sound, the distance from original high-water mark, as fixed by this map, to the exterior wharf lines, was, for the northern half of the avenue, about seventy-five feet, and from the centre of the avenue the line of original high-water mark curved inland, so that at the southerly side of the avenue it was about one hundred and twenty-five feet from the exterior wharf line. No line of original low-water mark was located either on this map or by the evidence, but at the time of the grant the land beyond this line assigned as original high-water mark, and within the lines of Elizabeth avenue extended, had been filled or built on to within twenty-five or thirty feet of the exterior wharf lines, and was occupied by the railroad company by its railroad tracks running across it and other structures. Elizabeth avenue then extended beyond South Front street, toward the shore, for about one hundred and sixty-eight feet, and for a distance of about one hundred feet from Front street it was a paved street.

The representation of the railroad company that the ferry company were the riparian owners of the land in front of which the grant was applied for, including the land claimed to be covered by the highway, must, for the purposes of this hearing, be considered as true. The riparian ownership of the ferry company was one of the points contested in the action at law and considered, and the claim that the state was the riparian owner was also presented and considered. The conclusion of the supreme court upon the proofs (which are the same now submitted) was that the ferry company was the riparian owner. *53 N. J. Law (24 Vr.) 493.* This decision cannot be reviewed here. The claim of false suggestion, therefore, rests solely on the effect of the representation of Elizabeth avenue on the map as terminating in South Front street. It is claimed that the map should have delineated the avenue as extended to the sound and over the land covered by the grant applied for, and that inasmuch as the avenue did in fact extend one hundred and sixty-eight feet further, and did lawfully extend to the sound at the time of the application, this delineation of it as terminating at South Front street was a material false representation or suggestion. This view as to the effect of the map

was very forcibly argued by counsel, but I do not think it is sound or correct. My view would be that so far as related to the highway the map, if it showed the lines at all, must be taken as intended to show the existing condition of the lands for which the grant was asked, as to a highway on these lands, or reaching to them. There was, in point of fact, and upon the ground, no highway existing beyond the line of original high-water mark, or reaching to this line as now fixed by the evidence; nor had a highway over these lands been used for twenty-five years. The ferry company and railroad company now claim, apparently in entire good faith, that the highway did not extend to the shore, and since 1849, at least, they had acted on that claim, and excluded the public from any use of a highway for some distance inland from this original high-water mark. Their representation by the map of the tract for which a grant was desired, as not crossed or reached by a highway, cannot therefore be imputed to them as a false representation of an existing fact, and it would be altogether exaggerating and misconstruing its effect to hold that the map was intended as a representation that no highway legally existed or could be claimed to exist beyond original high-water mark on the reclaimed lands or reached to them. Grants of the state should not be avoided for alleged false suggestion unless both the suggestion or representation and its falsity are made out. In this case the question as to the effect of the map and as to what representation was in fact made by the delineation of the highway on the map and annexing it to the application is clearly open to fair dispute, and if the representation is construed as defendants now claim—that is, as the delineation of the claim of the defendants and of the existing condition as to the highway over the lands applied for—it cannot be said to be false.

On the assumption, however, that the map in question must be considered as a false representation of the location of the highway, it should further appear, satisfactorily, that the grant in question, so far as it affected the highway, was made by the governor and commissioners in reliance on the false suggestion. The commissioners were authorized and directed by the riparian acts, as part of their duty, to locate the lines of original high-

water mark and to fix the prices of lands of the state beyond this line which they granted or leased. It cannot be assumed that the lands for which the grants were sought were not examined by them, or their agents for them, before certifying the boundaries and executing the grants, and if for the purposes of the application and certificate of boundaries and grant they acted in point of fact on the basis of the highway as actually existing, and as not extending to original high-water mark, such action on existing conditions were clearly within their power. The governor and all the commissioners were trusted officers of the state, and all men of the highest character and reputation, and during their lives the grant remained unchallenged. When it has now become impossible to produce evidence as to the effect actually given to the map on the point now in question, it would not be either safe or reasonable to assume that the grant was made solely upon information as to the location of the highway supplied by the map, and without making such further examination and inquiry as the interests of the state and of the public required. And as to the grant having been made by reason of the information received from the defendants and supposed to be conveyed by the map as to the termination of the highway, I should rather be inclined to the view that even if the map had shown the highway extending to the shore, or if the commissioners on examination of the property had ascertained that the highway as then actually used extended to the original high-water line or beyond it, and that there was a claim of highway to the shore, it may have been the judgment of the commissioners and their counsel that the riparian grant would not affect any public right of highway over the lands beyond original high-water mark, and that the location of the terminus of the highway upon the map was not material. In view of the decision of the court of errors and appeals in the *Hoboken Case, 36 N. J. Law* (*7 Vr.*) *540* (*1873*), rendered before the application, it cannot be said that it was either improbable or unreasonable that this view of the effect of the grant should have been taken. It is still the view of the grant taken by the counsel for the attorney-general and complainant, notwithstanding the decision in the *Elizabeth Case,* and the correct-

ness of this view is now awaiting the ultimate decision of the court of errors and appeals. So far as relates to the lands between original high water and low water mark, it is the view I would be inclined to take were the question before me an open one. Whether this was in fact the view of the commissioners and their counsel it is now impossible to ascertain, but it would not be just or right to set aside this grant of the state on the assumption that this view of the effect of the grant could not and should not have been taken. If this was the opinion of the commissioners and their counsel in making the grant, then, although it may have been made under a view as to the effect of the law on existing highways, subsequently held to be mistaken, the grant could not be said to have been made by reason of false suggestion. And as to any exclusive reliance on the applicant's representations by the map or otherwise, it further appears in the case, and must be considered, that for several years previous to the grant the riparian commissioners had grave disputes with the railroad company over their occupation of lands claimed to belong to the state, and that for the recovery of some of the lands included in the grant by the commissioners suits were pending, or had been directed, under the authority given by the riparian acts. The grant in question was made on a general settlement between the railroad company and the commissioners, who were throughout the whole dispute and proceedings for the grant represented by counsel, now also deceased. Under all the circumstances attending the grant, I think it would be going altogether too far to assume conclusively that the map, and the map annexed to the application or certificate, alone induced the grant, so far as it affected the highway, and to set it aside or reform it or control it as to the highway for that reason.

The cases relied on by complainant's counsel as holding that where false representations have been made with a view to a particular purpose, which has been attained, the burden of proving the immateriality of the representation, and that the end was not attained by the deception, rests upon the grantee, were all cases in which the transactions were questioned between those

who were the original parties to it, and while it was still practicable to procure the proofs by calling the grantors. *Smith* v. *Kay,* 7 *H. L. Cas.* 750, the leading case, was on this point a decision as to the facts admitted by a demurrer.

One of the grounds upon which the denial of purely equitable relief, on the ground of laches, is often based is that by reason of the lapse of time and delay in seeking relief the party against whom it is asked has been put in a situation, as to his proofs or otherwise, in which it would not be reasonable to place him, if the right is to be asserted. *Lutjen* v. *Lutjen, 84 N. J. Eq. (19 Dick.)* 773, 780, 781 *(Court of Errors and Appeals, 1902)* ; *Rochefoucald* v. *Boustead, 1 Ch. 196, 210 (1897)*.

The equitable rules relating to the effect of laches and acquiescence, are enforced against the state when it is a suitor for equitable relief as well as against private suitors. *Attorney-General* v. *Delaware and Bound Brook Railroad Co., 27 N. J. Eq. (12 C. E. Gr.)* 1, and cases cited at *p.* 27. And it is insisted in this case that the information should be dismissed on the ground of laches and acquiescence. While the delay in filing the information until all the officers who executed it on the part of the state are dead may not be sufficient of itself to deprive the state of equitable relief, it is certainly sufficient to prevent it from insisting upon the application of a mere rule of evidence relating to the burden of proof as the basis for deciding that in the absence of proof to the contrary it must be conclusively presumed that the grant in question (so far as it affects the highway) was in fact induced by the representation on the map as to the termination of the highway.

These riparian grants, as was justly said by Vice-Chancellor Pitney, in *Morris and Essex Railroad Co.* v. *Jersey City, 63 N. J. Eq. (18 Dick.)* 54, are made with great care and caution by trusted public servants, after full moneyed consideration paid to the state, and under safeguards designed to protect the state against imposition and fraud. The courts have therefore always given the grants great value, and they should not be set aside, reformed or controlled in their operation, upon the ground that they were induced by false suggestion or fraud, in the absence of clear and cogent proofs.

Upon the whole evidence I conclude that the informant and complainant have failed to establish that the grant was procured by false suggestion, as alleged, and the information and bill must therefore be dismissed.