188 N.J. Super. 145 (1983)
456 A.2d 534
HOUSING AUTHORITY OF THE CITY OF ATLANTIC CITY, A/K/A HOUSING AUTHORITY AND REDEVELOPMENT AGENCY OF ATLANTIC CITY, PLAINTIFF,
v.
THE STATE OF NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Chancery Division Atlantic County.
January 7, 1983.
*146 Charles Lee Harp, Jr. for plaintiff (Archer & Greiner, attorneys).
William R. Serber, co-counsel for plaintiff (Kirkman, Mulligan, Bell & Armstrong, attorneys).
Elias Abelson for defendant (Irwin I. Kimmelman, Attorney General, attorney).
GIBSON, J.S.C.
This is an action to quiet title in which plaintiff has moved for summary judgment. Presented by this motion is the question of whether the State is estopped from making claim to property previously flowed by tidal waters because of riparian grants on adjoining lands previously issued to plaintiff's predecessors in title. The issue appears to be one of first impression.
The undisputed facts may be summarized as follows: Plaintiff Atlantic City Housing Authority (Authority) is the owner of Atlantic City's 80-acre Uptown Urban Renewal Tract. Defendant State of New Jersey claims riparian ownership of a portion *147 of the renewal tract lying between the landward boundaries of three previous riparian grants and what the State now contends was the high-water line in 1869. Except for a small piece belonging to a third party, the entire disputed parcel (referred to by the parties as the "gore") is owned by the Authority, which has spent close to $1.5 million for acquisition of the land, demolition of existing buildings and relocation of residents.
Of the three pertinent riparian grants, two were made on October 12, 1878 and one on July 8, 1899; all were issued under the authority of the Riparian Act of March 21, 1871, L. 1871, c. 256, § 1 (now N.J.S.A. 12:3-10). That act permits the State to make riparian grants to upland owners of "any lands under water in front of" their lands. The procedure for the issuance of grants under this statute is set forth in N.J.S.A. 12:3-7, and it permits the State, upon application, to "designate" the lands to be encompassed by the grant and to "certify" the boundaries of the grant and the amount of compensation.
All three grants recited that the grantees were owners of their respective uplands and refer to the "high water mark" or "high water line" without specifying where that is. Each grant, however, is accompanied by a map showing the high water line. The 1899 grant to James Reilly also contains a proviso declaring the grant void if Reilly were not the actual upland owner. Although there were a number of successive title holders to the grants and the adjoining "upland" over the years, no claim was made to any part of the property by the State until 1979. At that time the State relied on the theory of "avulsion" and contended that between 1869 and 1878, prior to the issuance of the grants, there was a sudden alteration in the shoreline creating the area that now constitutes the gore. Because of its claim that the changes was sudden and violent rather than "gradual and imperceptible," the State laid a riparian claim to the new land. See Garrett v. State, 118 N.J. Super. 594, 600-01 (Ch.Div. 1972) (distinguishing avulsion from accretion).
*148 Confronted with this claim, the Authority filed the instant suit seeking to quiet its title to the gore. The State counter-claimed, contending that its interest in the land adjoining the grants was never conveyed and is superior to plaintiff's. The Authority now moves for summary judgment on the ground that the State is estopped by virtue of its prior riparian grants from asserting its title to the gore. Its position may be summarized as follows: The prior grants explicitly recognize the grantees as owners of the upland, and the State cannot now deny that recognition to claim the upland for itself. Moreover, even if the State did not recognize the grantees' upland ownership, it nevertheless, pursuant to statute, "designated" and "certified" each grant's boundaries. The high-water line that constitutes the grants' landward edge also formed the boundary between grant and privately owned "upland." The Authority contends that the State cannot be permitted to "abandon" its own boundary and lay riparian claim to lands it previously treated as "upland"  particularly after 100 years and millions of dollars of expenditures by the Authority and its predecessors.
The evaluation of this position as well as that of the State is well suited to a motion for summary judgment. Such a motion is appropriate when the record in a case shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. R. 4:46-2. The facts must be construed liberally in favor of the nonmoving party and the burden is on the movant to establish both the absence of a material factual issue and the propriety of the requested legal judgment. See Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 73-75 (1954). In the instant case, despite the State's contrary contention, there are no disputed issues of material fact. For the purposes of its motion, the Authority assumes the validity of the State's "avulsion" theory. There is no dispute that the three riparian grants were made and that they were issued under the authority of the act of March 21, 1871. Although the meaning of the grants is in dispute, that is a question of law. Nor does the State challenge the Authority's *149 evidence of "reliance"  the passage of time between the grant and the current claim, the prior "peaceable possession"[1] and the money spent for acquisition, construction, demolition and relocation. As a result, the sole issue presented by this motion is whether these undisputed facts justify estopping the State from asserting its riparian claim to the "gore" area.
Estoppel is an equitable doctrine, founded in the fundamental duty of fair dealing imposed by the law, that prohibits a party from repudiating a previously taken position when another party has relied on that position to his detriment. Generally, its elements are a representation (or misrepresentation), knowledge that a second person is acting on the basis of that representation, and substantial detrimental reliance by the second person. See Carlsen v. Masters, Mates & Pilots Pension Plan Trust, 80 N.J. 334, 339 (1979). In such circumstances the first person is prohibited from repudiating the truth of his representation.
In assessing the Authority's contention that the prior riparian grants estop the State from claiming the "gore," careful attention must be given to the authority under which these grants were issued. The act of March 21, 1871 (N.J.S.A. 12:3-10) provides in pertinent part:

Any riparian owner on tidewaters in this State who is desirous to obtain a lease, grant or conveyance from the State of New Jersey of any lands under water in front of his lands, may apply to the board, which may make such lease, grant or conveyance... which ... shall vest all the rights of the State in said lands in said lessee or grantee. [Emphasis supplied]
As a precondition to the grant's effectiveness, then, the applicant must be a "riparian owner"  that is, the owner of uplands adjoining tidelands, and the grant may extend only to the lands "under water in front of his lands."
Under the above statute the commissioners who issued the grants had "no power to examine into and decide [an] applicant's title to the [upland]." Ocean City Ass'n v. Shriver, *150 64 N.J.L. 550, 565 (E. & A. 1900). That limitation on the issuance of grants to only riparian owners was enforced not by an inquiry into the applicant's title, but by making the grant's validity contingent upon actual ownership. Ibid.; see, also, Brown v. Morris Canal and Banking Co., 27 N.J.L. 648, 652-53 (E. & A. 1858). Should a grant be made to a nonriparian owner, it would be ultra vires and void ab initio. See Polhemus v. Bateman, 60 N.J.L. 163, 165 (E. & A. 1897); Fitzgerald v. Faunce, 46 N.J.L. 536, 594 (E. & A. 1884). Thus, to the extent the Authority contends the three riparian grants constituted recognition of its predecessors' upland title, its estoppel argument must fail. Based on the authorizing statute, the State had neither the obligation nor the power to recognize title; therefore, such recognition cannot provide the "representation" by the State that is the basis of an estoppel claim.
The recitation in the grants of grantees' upland "ownership" is not to the contrary. That language can mean no more than the statute permits it to mean  in this case, an "acknowledgment" of the applicants' claim to the upland. Nor, for similar reasons, is it significant that the 1899 grant, to Reilly, expressly conditions the grant on ownership while the others do not.
However, the Authority makes a further argument that the "designation" and "certification" of the grants' high-water "boundary"  the line between the grant and the claimed "upland"  constitutes a formal recognition by the State of the landward extent of its riparian claims. In support of this position it cites Attorney General v. Central R.R. Co., 68 N.J. Eq. 198, 223-24 (Ch. 1904), aff'd 70 N.J. Eq. 797 (E. & A. 1906), to the effect that, after so many years, it would not be reasonable to presume that the riparian commissioners simply relied on the representations of the applicants in making the three grants.
On careful reading, Central R.R. Co. does not support plaintiff's position here. That case involved the State's attempt to reclaim out of a prior (1874) grant of filled tidelands the land within the bed of a public highway. The State argued that the *151 map of the grant submitted by the railroad fraudulently failed to show the highway's path over the granted land. The court held that the omission (if there was one) was not false or fraudulent; it then went on to say that even if the map were fraudulent, reliance by the commissioners, after so many years and after all the principals had died, could not be presumed for two reasons. First, the commissioners, at the time of the grant, could have mistakenly believed that it preserved the State's rights in the highway.[2] Second, the grant in question settled a long dispute between the State and the railroad over the occupation of the land during which both sides were represented by counsel. Moreover, the court did not estop the State from challenging the grant; it simply shifted to the State the burden of proving fraud. Id. 68 N.J. Eq. at 223-226.
The instant case is distinguishable in several significant respects. First, it does not involve previously granted land but rather land to which the State has never before laid claim. Second, the three grants involve none of the unique factual circumstances, such as an ongoing, negotiated dispute over title, that contributed to the Central R.R. Co. decision. Most importantly, the nature and legal effect of the grants in the two cases is different.
The grant in Central R.R. Co. was "made in absolute terms, independent of any riparian title, and without reference to any particular statute." Elizabeth v. Central R.R. Co., 53 N.J.L. 491, 497 (1891). The grants in the instant case were made under the act of March 21, 1871; that act limited the grants to land "under water in front of" the grantee's land. The act applied only to submerged lands. The power to grant lands "not now ... under tidewater ... lying between what was at any time heretofore the original high-water line and the *152 exterior lines" was not given the commissioners until the act of April 7, 1871 (L. 1871, c. 605, now N.J.S.A. 12:3-12). See Bailey v. Driscoll, 19 N.J. 363, 371-72 (1955). Under the act of March 21, 1871 the commissioners could only deal with those lands then submerged, and thus accepted the high-water line at the time of the grant, just as they were compelled to accept the applicant's claim to upland ownership. It follows, therefore, that the certification of the high-water boundary of the three grants cannot be read as accomplishing anything more than the statute authorized and thus not as a limitation on the landward extent of the State's riparian claims.
The language of the grants themselves supports this analysis. They make no reference to the claimed upland or its dimensions, other than to recite that the grantee is the owner of lands fronting the Atlantic Ocean, a fact which the State does not now dispute. The granted land is expressly described as being under water, and the reference to the high-water line clearly contemplates the existing line, with no effort made other than to recognize what was then "submerged lands." Thus, neither the recitation of upland ownership nor the designation and certification of the grant's boundaries furnishes a basis for estopping the State's riparian claim to "upland" property. Accordingly  contrary to the Authority's contention  this is not the case of estoppel by deed reserved in O'Neill v. State Highway Dep't, 50 N.J. 307 (1967). Estoppel by deed prohibits a grantor from denying the grantee's right in the land conveyed. Suburban Golf Club v. State Highway Comm'n, 92 N.J. Super. 125, 139 (Law Div. 1966). In the instant case, the disputed land is the land adjacent to that conveyed; moreover, the grant itself contains nothing that can be construed as a representation by the State about its interests in the adjacent land.
In addition to the limitations noted above, the Authority's construction of the grants runs contrary to the established principle that such grants must be strictly construed in favor of the State. See Polhemus v. Bateman, supra, 60 N.J.L. at 166. It is also inconsistent with the policy underlying that principle: *153 the State's concern for the preservation of its riparian rights and the statutory dedication of tidelands to support the constitutionally mandated perpetual fund for public schools. N.J.S.A. 18A:56-5; N.J. Const. (1947), Art. VIII, § IV, par. 2. Such principles preclude the loss of the State's title in tidelands by adverse possession or prescription, Quinlan v. Fair Haven, 102 N.J.L. 443, 446 (E. & A. 1926), and prohibit the making of a gift of the tidelands, even for a public purpose. See Garrett v. State, supra, 118 N.J. Super. 598-99.
Similarly, in cases involving riparian claims, although not precluded totally, "neither estoppel nor laches is applied against the State to the same extent as against private parties." O'Neill, supra, 50 N.J. at 319. In Newark v. Natural Resources Council, 82 N.J. 530 (1980), cert. den. 449 U.S. 983, 101 S.Ct. 400, 66 L.Ed.2d 245 (1980), the state Supreme Court, in rejecting an attempt to estop a state riparian claim, emphasized that
... the party seeking the benefit of estoppel has the burden of establishing that an officer of the State, conscious of the State's true interest and aware of the private owner's misapprehension, stood by while the private owner acted in detrimental reliance. [at 545; citation omitted; emphasis supplied]
Significantly, the court rejected a claim that the State's own riparian maps, which generally depicted only "the banks of well-defined streams," constituted a disclaimer of title to lands outside those "defined" areas. Id. 82 N.J. at 545-546.
Inaction or delay on the State's part, without more, is not grounds for estoppel. O'Neill, supra, 50 N.J. at 321. In the instant case it is difficult, given the statutory predicate for the three grants, to accuse the State of more than delay in giving notice of its public holdings. Certainly there is nothing to suggest that the State was "conscious of its own interest and aware of the private owner's misapprehension."
The Authority's position, if accepted, would give the State but one binding opportunity to stake out the extent of its riparian claims, despite the possibility of mistake or  as appears to be the case here  subsequent discovery of a basis for a claim. Given the present setting, such a position would not comport *154 with the principles laid down in Newark and O'Neill. "Although the State may well be in a better position than a third person to know the extent of its sovereign ownership, the vast extent of land flowed by the tide and the obvious difficulty in delineating ownership weigh against divestiture by estoppel." Newark, supra, 82 N.J. at 545.
The Authority suggests that this approach may create detrimental uncertainty among shore property holders about the validity of their title. It also contends that the State will use a decision in this case, giving it title to the gore, to "bootstrap" a claim to the granted lands themselves, on the ground that the grantees were not riparian owners. These may be legitimate concerns, although insufficient under Newark and O'Neill to support estoppel. However, there are several factors present which soften the perceived detrimental effects.
First, in both instances, the consequences feared by the Authority are contingent upon the State's establishing its riparian claim on the merits at trial  by no means an easy task. Second, much of the potential uncertainty about riparian claims was eliminated in 1981 with the passage of N.J. Const. (1947), Art. VIII, § V, which cut off the State's riparian rights to any unclaimed land not flowed by tide for 40 years. Finally, any attempt by the State to reclaim land previously granted may well require the application of the doctrine of estoppel by deed, a doctrine which the Authority incorrectly sought to apply in this case.
In summary, any effort to estop the State from asserting claims to the area in dispute because of previously issued riparian grants must take into account not only the limited authority under which the grants were issued, but also the various principles which favor the preservation of the rights of the State in such a setting. Based on the facts submitted here those limitations preclude the application of estoppel and require an evaluation of each party's position on the merits. Plaintiff's motion is therefore denied.
NOTES
[1] Although the State does not concede this issue, it assumes plaintiff's position for purposes of the motion.
[2] That question was settled to the contrary  subsequent to the grant  in Elizabeth v. Central R.R. Co., 53 N.J.L. 491 (1891), a predecessor to the case under discussion.