The complainant is a subsidiary corporation of the National Association of Manufacturers, and was the proprietor of two periodical publications having to do with export *Page 243 
trade. In 1911 it leased the periodicals to a corporation known as Steven DeScesznak, Inc. (the principal spirit of which was a man named Steven DeScesznak), with an option to purchase for the sum of $100,000 cash on or before August 1st, 1916, which was extended to endure until January 1st, 1921. These periodicals did not prosper financially, and, in or about the year 1914, the defendant J. Philip Bird was placed in charge of the financial transactions of Steven DeScesznak, Inc., for the purpose of safeguarding the interests of the complainant and the National Association of Manufacturers. This defendant was the general manager of the National Association of Manufacturers and vice-president and a director of the National Manufacturers Company. Finally, in the summer or fall of 1916, the financial condition of the DeScesznak company became so alarming that the governing members of the complainant determined that they must get rid of the magazines, and for that purpose appointed a committee of the directors of the complainant to negotiate their sale. Bird was a member of that committee, as were also the president (Pope) and two others named Boudinot and Abbott. It appears that negotiations were carried on with Pope, who exercised a potent influence, to authorize the DeScesznak company to pay the option price in the form of $100,000 of thirty-year coupon, seven per cent. bonds instead of cash. This Pope refused to consider.
By some method the option price was subsequently reduced to the sum of $10,000, and the payment by the lessee of a demand note or notes amounting to $12,500 held by the complainant, and furnishing $2,500 to DeScesznak for working capital. A new option to that effect was given by the complainant. Both before and after the giving of this latter option Bird undertook to find someone who would advance the necessary cash to take advantage thereof, and, in fact, considered purchasing the papers himself. In this connection it should be pointed out that he gives highly contradictory explanations of the reason he gave up the latter idea. In one place he says that it was because he intended committing his resources to another venture called "The International Engineering *Page 244 
Works," whereby he would be left without means to acquire the publications. In another, he says it was because Pope, his superior, frowned on it. In the course of his search for an investor he attempted to enlist the services of another defendant, Mr. Kellogg, a member of the bar of this state. The latter, after some investigations, declined to advise any of his clients or acquaintances to risk any money in the business, because, as he expressed it, the governing spirits of the National Association of Manufacturers were men of wide business experience, and if they felt that the business was not remunerative he felt a natural reluctance to advise anyone to invest therein. Subsequently, however, he did appear with an assignment of the option executed by DeScesznak, Inc., and, upon paying the necessary $10,000 to the complainant, and providing the additional $15,000 capital for the DeScesznak company, secured a bill of sale of the periodicals, taking title in his own name. Within a very short time thereafter he transferred the business to the DeScesznak company, and, in consideration thereof, took from it $100,000 of debenture bonds, maturing in thirty years, bearing interest at the rate of seven per cent., and in coupon form. It is conceded by the defendants that in this transaction he acted as Mrs. Bird's agent, and has continued in that capacity to collect the interest thereon and the return of the $15,000 in cash, advanced to the DeScesznak company. The complainant maintains that the defendants Mr. and Mrs. Bird should be decreed to hold the bonds as trustee for it, and should be compelled to account to it for all interest collected upon coupons upon the grounds — (a) that Bird, in his fiduciary capacity, has fraudulently purchased the complainant's periodicals, and realized a large profit thereon, although taking title in his wife's name, and (b) that a purchase of trust property at a sale held by a quasi-trustee is voidable at the option of the beneficiary when purchased by the wife of the fiduciary, equally as if purchased by him.
It is conceded that there should be no decree as against Mr. Kellogg. *Page 245 
I think there can be no abiding doubt that the proofs indicate that Bird has profited by the position of trust in which he stood to the complainant. It will be recalled that not only was he an officer of the complainant company, but he was the officer selected by it to represent it in the councils of the DeScesznak company whereby he, of course, became more familiar with the latter and its condition than any other officer or director of the complainant. In the beginning of 1917, when its affairs reached a condition such that the directors of the complainant became alarmed, he appears to have exercised himself more actively than anyone else to save to the lessee company its business, and even went to the length of conferring with Pope about making the purchase for himself. This, I confidently believe to be true. But when told by the latter that he must not do so, he then abandoned the scheme. He then talked with one of his employes named Dingwall, and arranged with the latter to purchase the publications for him (Bird), and thereafter a resolution was adopted by DeScesznak, Inc., with Bird present, actually authorizing the issuing to the said Dingwall of $100,000 of bonds of the same description as mentioned above. This was not consummated, but the bonds were afterwards actually issued to Mrs. Bird.
Bird says that one night in the early winter of 1917, after he had returned home, he said to Mrs. Bird that he was being pressed to go through with the International Engineering Works investment, and continued:
"I went home one night and told her that I had made up my mind to take up the option on the International Engineering Works of Framingham, and that, so far as I was concerned, I was disgusted with the whole Industrial American situation, and we chatted awhile about it, and I said to her then that I hadn't lost faith in it; I thought it was a good thing, but I had decided to take up the option of the International Engineering Works at Framingham, and she turned to me and said:
"`Well, do you think it is a good thing?' and I said, `I do.' *Page 246 
"And she said, `Why can't I buy it?' and I said, `I don't know; I will ask Colonel Pope and see.'
"And she said, `Well, what would I do?' I said, `The first thing you would do would be to go and consult some lawyer.'
"And she said, `Whom would I go to?' and I said, `I don't know.'
"And she said, `Well, I know Mr. Kellogg.' I said, `He would be a good one, because he has been familiar with the situation and he can advise you about it.'"
He says that he had just sold three hundred shares of stock, one hundred of which he had presented to her when he purchased it in 1911, and that her share of the proceeds of the sale, amounting to $10,000, he had deposited along with his own funds in the Irving National Bank, New York City, and that this was the money with which she intended to finance the purchase of the publications. In this he is corroborated by his wife, and the circumstantial story told about the withdrawal of the funds from the bank and the turning of them over to Mr. Kellogg is corroborated by that gentleman, Mrs. Bird and one of his daughters. While I have no doubt, especially from the testimony of Mr. Kellogg, that Pope was acquainted with the purchase by Mrs. Bird, it is an especially significant fact that he never communicated her appearance in the transaction to either of the other two members of the committee charged by the complainant with ridding it of the magazines. Colonel Pope, it is fair to assume from the testimony, was a very elderly man, who died in April of the year following this transaction. There was the darkest secrecy maintained otherwise from all the world about the interest of Mrs. Bird. Up to the time of the final hearing Mrs. Bird had received about $35,000 in interest and $15,000 in return for her advance for working capital of DeScesznak, Inc. Out of the latter sum she had repaid her husband some $3,000 of the fifteen he had loaned her, and he said that the rest was gone, and he had no great hope that he would ever be repaid. At any rate, according to her own showing, she has received and disbursed, approximately, $47,000, for which she is unable to account in any rational way. *Page 247 
Assuming all the evidence presented by the defendants to be true, nevertheless, it is impossible to refuse granting the prayer of the bill as to Mr. and Mrs. Bird. While, under this assumption, no actual fraud would be present, there has been abundant proof of constructive fraud. Falsehood is an ingredient, whether at law or in equity, and whether, by false representations or suppression of the truth, in fraud of the first class. It does not necessarily enter into the proof of the second class at all. One example of constructive fraud arises from the relation of the parties to each other which will frequently render a transaction, good as between strangers, voidable at the option of one of the parties where the other has occupied towards him the relation of a fiduciary. This phase of the law is most strikingly illustrated by a transaction between a trustee and the beneficiary of the trust concerning the subject-matter thereof, but it has been applied in a great many instances where no technical trust exists, such as dealings between a corporation and one or more of the directors, as well as between principal and agent. While Bird was not a director of the National Association of Manufacturers, he was an officer of that company, as well as a director of the complainant, and had been in the most solemn manner designated as the complainant's agent to keep it informed as to the condition of the DeScesznak company. As such agent he was precluded from dealing with the subject-matter of the confidence reposed in him to his own advantage.
Equity regards and treats this relation in the same general manner, and with nearly the same strictness as that of trustee and beneficiary. The underlying thought is, that an agent should not unite his personal and his representative characters in the same transaction, and equity will not permit him to be exposed to the temptation, or brought into a situation where his own personal interests conflict with the interest of his principal, and with the duties which he owes to his principal. Pom. Eq.Jur. § 959. This author in the same paragraph also refers to the right of the principal to avoid the transaction, and supports both propositions with a wealth of authorities, including Dodd
v. Wakeman, 26 N.J. Eq. 484. *Page 248 
That was a case where the defendant had purchased at an execution sale under a parol contract to hold it for the benefit of the complainant. Vice-Chancellor Van Fleet states the general rule applicable in all instances, as follows:
"An agent or trustee undertaking a special business for another cannot, on the subject of that trust, act for his own benefit to the injury of his principal."
Applying the opposite rule to the case at bar, it is apparent that Bird has not in his own defense shown that he fully discharged the obligations that equity imposed upon him. He did not report, either to the directors of the complainant or the members of the special committee appointed by them for the sale of the publications, the fact of his intention to purchase, or permit his wife to purchase, the same from the company. His reason for not doing so is of no moment. No matter what he may have told Pope, it is clear and undisputed that he did nothing more than express his surprise, at most, to Boudinot that Pope had decided to sell the magazines for $10,000 instead of the price of $100,000 expressed in the original option. Counsel quarrels with this statement, but fails to point to a word in the evidence beyond it. It seems to me clear that, unless the vigilance is to be relaxed with which this court has always watched transactions between individuals so related as this defendant was to the complainant, he must be made to give up the benefits he has acquired. That this strict morality is not to be expected of one in a confidential relation, except where a transaction involving land is under examination, is not consonant with reason or the determination of this court in Porter v.Woodruff, 36 N.J. Eq. 174 (constructive fraud in the purchase of railroad stock).
While Mr. Bird has been spoken of as the actual purchaser of the magazines (although the legal title to them, as well as the bonds for which that title was subsequently transferred to DeScesznak, Inc., were in the name of his wife), I agree with counsel for the complainant that, for the purposes of this argument, Mr. and Mrs. Bird were, in contemplation of equity, one and the same individual, and that the sale by a *Page 249 quasi-trustee of the trust property to his wife is equally vicious as if made to himself. It is impossible to avoid an application of the rule clearly expressed in the opinion delivered by Mr. Justice Van Syckel in Bassett v. Shoemaker,46 N.J. Eq. 538. In that case an executor, pursuant to authority contained in his decedent's will, sold real estate to his wife at public auction. One of the beneficiaries under the will filed his bill to set aside the sale and conveyance, and was successful on that question in this court and the court of errors and appeals. In the latter court it was said:
"The exclusion of the wife as a purchaser, where the husband sells as a trustee, is not so much for the reason that he may, subsequently, become entitled to some interest in her lands, as on account of the unity which exists between them in the marriage relation. The case falls clearly within the spirit of the principle, which excludes the husband himself."
Equity looks to the substance and not the form, and it seems to me impossible for anyone to consider the relationship of husband and wife, and disagree with Mr. Justice Van Syckel's conclusion that the spirit of the rule could, in almost every instance, be subverted where the married parties were living in the state of amity that exists between the principal defendants in the case at bar. With this clear exposition of the law by the court of errors and appeals, this court is precluded from establishing a different rule, even if it seemed more advisable, which to me it emphatically does not. The rule is clearly not disturbed by the Married Woman's act, which was enacted before Bassett v.Shoemaker, supra.
It is said on behalf of the defendants that fraud without injury is not actionable. This is true. But Bird did injure the complainant when he failed to properly discharge his duty and permitted his wife to take the fruits of his own wrong. The case of Marsh v. Cook, 32 N.J. Eq. 262, involved a charge by a complainant that he had induced her to execute a mortgage by falsely representing to her that it was not a mortgage but a mere acknowledgment of indebtedness, which indebtedness was legally and equitably extant. The vice-chancellor held that the mortgage only secured the amount of money that *Page 250 
the complainant justly owed to the defendant, and refused to give effect to a transparent attempt on the part of a debtor to deprive a creditor of his honest due. That is an entirely different situation from the one sub judice, where these defendants, upon their own showing, are revealed as having secured an inequitable advantage over one toward whom one of them owed a duty that was not discharged. They have already enjoyed an income of, at least, $35,000, on an investment of $10,000. It would seem that the loss of this enormous return, besides the bonds secured by a sinking fund, is a grave injury. Who can say that if Bird had openly, frankly and completely disclosed to the other members of his committee his reasons for thinking that an acceptance of the DeScesznak company bonds would be advantageous to the complainant, that the determination to have nothing to do with them would not have been changed? In the absence of proof to the contrary, it is fair to assume that Colonel Pope was a reasonable man, open to fair argument. If this was so, then the other members of the committee joining with Mr. Bird might well have overcome Pope's disinclination to accept the bonds in payment for the magazines. There has been evidence to indicate that Pope had a considerable influence in the counsel of the complainant, but there is nothing to indicate that this great and powerful business, as it was shown to be by the proofs, was a one-man affair. Not only would it have been the duty of Bird to have gone to this extent in safeguarding the interest of his company as a single member of this committee, but, doubly so, in view of his having been selected out of all its officers and directors to be the agent of the complainant in the affairs of the DeScesznak company. At any rate, it was his duty, and, having failed to perform the same, the complainant is entitled to demand the benefit of the transaction.
The remaining point requiring any attention is the allegation of laches. The transaction out of which this suit arises was consummated in March, 1917, and the bill of complaint was filed in December, 1922. DeScesznak testified that he had first notified the officers of the complainant of Mrs. Bird's purchase in the month last named, and in that he is corroborate *Page 251 
by Boudinot and Abbott, two of the members of the committee appointed to represent the complainant in the sale of its publications. Prior to that time, however, in the summer of 1921, a committee of the National Association of Manufacturers held a meeting at which Mr. Bird was examined concerning the sale of these periodicals. At that time he gave conflicting testimony. In one part of his story he said that Mr. Kellogg was the purchaser, although he knew that this was not so. In another place he said that he did not know whom Mr. Kellogg represented, although, of course, his testimony on the stand in this case clearly and completely contradicts that statement. And, still later, he declined to answer any questions as to the beneficial purchaser, upon the ground that it was a matter involving the private affairs of DeScesznak, Inc., but offered to make a revelation to the committee privately all he knew. The last reason for his reticence was given on the witness-stand in the final hearing of this suit, and was to the effect that Mrs. Bird disliked DeScesznak, and did not wish him to know of her ownership of the bonds. From this it is argued that the complainant was put upon notice as to the facts Bird could have related to it, and, having negligently refused to pursue the investigation, should not now be heard to complain for having slept upon its rights.
While it is true that the complainant appears to have become suspicious as early as 1921 that all the dealings surrounding the sale of its periodicals had not been fair and above board, there is, of course, nothing to indicate that it was in possession of facts and the proof thereof upon which it could have safely initiated this suit and gone to final hearing. It requires neither argument nor authorities to prove that suspicion does not amount to knowledge or notice. A further difficulty is, that the complainant would have been justified in viewing with great suspicion any offer made by Bird to present it with information under the circumstances of his testimony before its committee, and, especially, in view of the belief that appears to have entered the minds of its governing officers that he had much to conceal. There can be *Page 252 
no doubt that Bird could have furnished the committee with abundance of information, but there is room for much doubt that he would have done so.
Furthermore, even if it were apparent that as early as the summer of 1921, or less than a year and a half before the filing of the bill, facts had come to the information of the complainant putting it upon inquiry, there is still no proof that should invoke the application of the doctrine of laches. While it has been said that probably no other principle of equity has resulted in more conflicting statements by the judiciary than laches (Pom. Eq. Jur. 1440), still it is clear that the doctrine has a double aspect. Courts of equity have followed the law in those cases where there has been a lapse of time, that in the legal tribunals would result in the statute of limitations being a bar. That is not the case here. The other aspect is the one referred to by Vice-Chancellor Green in Hall v. Otterson, 52 N.J. Eq. 522,
where, although the statutory period may not have expired, the application of equitable principles operate to prevent relief being given. In the case at bar no new titles or equities have arisen, nor have the defendants by reason thereof changed their position, and neither have witnesses died or evidence been dissipated, or any other fact proved that would make a decree for the complainant inequitable. If the defendants, or either of them, have spent the proceeds of the gains which should have been the complainant's and enjoyed the benefits thereof, that is no reason they should have their own acts converted into a shield to protect them from any just demand that the complainant makes.
I will advise a decree declaring that Mrs. Bird took title to the DeScesznak bonds as trustee for the complainant; that she and her husband account to it for all profits realized thereupon, and dismissing the bill as to Mr. Kellogg. *Page 253