19 N.J. Super. 147 (1952)
88 A.2d 271
TOWNSHIP OF SPRINGFIELD, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF,
v.
HELEN F. BENSLEY, ET ALS., DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided March 29, 1952.
*151 Mr. Max Sherman, attorney for plaintiff (Mr. Lester Sandles, of counsel).
Mr. Herbert M. Ellend, attorney for defendants Helen F. Bensley and Carl H. Flemer.
Mr. Samuel Daniels, attorney for defendants Nicholas Angleton, Short Hills Village, Inc., Short Hills Village Sections 2 & 3, Inc., and Liberty Construction Company.
Mr. Morris M. Schnitzer, of counsel with all the defendants.
STEIN, J.S.C.
The defendants hold a building permit issued by the building inspector of the plaintiff township on December 11, 1950, allowing the erection of a garden apartment development to contain 252 apartments. The project, as shown on the building plans submitted to the building inspector and upon which he acted, called for 24 separate structures to be erected in three sections and containing a total of 252 apartments. The plot plan submitted with the detailed plans to the building inspector showed the following allocation of apartments:

 Section A 110 apartments
 Section B 80 apartments
 Section C 62 apartments
 ______________
 Total ........... 252 apartments

Between December 11, 1950, when the building permit was granted, and March 10, 1952, when the instant action was commenced by the township, the defendants had steadily proceeded with the erection of the buildings, so that before the suit was brought 11 of the 24 buildings were completed and were fully occupied. Those 11 buildings comprise Section A of the project and within them are contained the said 110 apartments, of which 36 are three-room apartments. *152 The project in respect of Sections B and C, consisting of the remaining 13 buildings, has progressed to the extent that the ground has been levelled, some of the foundations have been laid, and contracts have been awarded amounting to considerably over $1,000,000. The defendants have obtained a mortgage, already recorded, for $1,300,000, encumbering Sections B and C, and under the arrangements with the mortgagee that loan may be cancelled by the lender if in May of this year the buildings have not reached a certain stage of construction. The proofs are that in connection with those two sections the defendants have already by payments and by commitments incurred an outlay of over $1,000,000, in addition to which they have expended considerable moneys in putting in the principal utilities which service the project as a whole.
In the condition of things last stated, the municipality now seeks what is nothing more than a revocation of the building permit to the extent that that permit permits the erection of more than 182 apartments. The various forms of relief asked for in the complaint all resolve themselves into the single purpose of having the court adjudicate that the defendants may proceed to erect the 24 buildings but that those buildings must not in the aggregate contain more than 182 apartments. The attack is directed at the defendants' intention to include in the buildings the additional 70 apartments, being the difference between 182 and 252. That attack is based upon the claim that there exists between the municipality and the builders a written agreement dated October 23, 1950, attached to which is a map showing 24 buildings containing 252 apartments, whereas the map that should have been attached is one showing 182 apartments. A substitution of maps, either the result of fraud or mistake, is suggested. The defendants deny this and say that the municipality knew whenever it acted in connection with the project that it called for 252 apartments. This is, in short, the factual point of controversy. From the proofs before me the following facts stand established and found:
*153 The building project is on a tract of large acreage, approximately 18 1/2 acres of which are in the plaintiff township and about an acre and a half in the adjoining Town of Millburn. On or about August 29, 1950, the sponsors of the project prepared a first or preliminary sketch showing the proposed group of garden apartment houses, consisting of 24 buildings and containing 182 apartments, none of which was shown as a three-room apartment; only four-, five- and six-room apartments were indicated. The 18 1/2 acres were then located in what under the then existing zoning ordinance was a Residence "A" zone, in which multiple apartment dwellings were not permitted. The defendants sought an amendment to the zoning ordinance so that these acres of land would be placed in Residence Zone "D," where such garden apartment structures were permitted. Several public hearings were held, at which appeared representatives from an association called the Colfax Civic Association, and these persons vigorously opposed any change which would permit garden apartments upon the tract in question. No question was raised as to the number of apartments, but the criticism was of garden apartments in general, the objectors preferring that the property remain zoned for one-family dwelling houses. On December 6, 1950, the members of the township committee, it being the governing body of the plaintiff municipality, unanimously amended the zoning ordinance in the respect sought and the tract in question was brought within the operation of the provisions relating to Residence Zone "D." At the township committee meeting held that day, and before the amendment was passed, the building inspector and the members of the township committee had before them the earlier map of August 29, 1950, which, however, had been previously revised in several particulars and which revised map showed the same number of buildings, the same coverage of buildings over land, but showed that those buildings would contain 252 apartments. On one of those maps the building inspector himself made notations in his own handwriting. No objection was expressed *154 by any one to the fact that a greater number of apartment units were shown on the revised map. That matter was not one of any concern, since there was no increase in number or size of buildings or in land coverage. The increase in the number of apartments was entirely the result of changing a number of the six-room apartments into three-room apartments. The revised map before the township committee on December 6, 1950, showed the number of three-room apartments as the builders now wish to include in the buildings and as they have already been included in the 11 buildings completed and now occupied.
When a few days later the architect, Chirgotis, presented to the building inspector the detailed building plans, he submitted therewith the building plot plan which was the same as had been before the township committee on December 6, 1950, when the ordinance was amended. The inspector, upon examining the plan and again seeing that it called for 252 apartments, issued the building permit, and on it he wrote in his own hand 252 as the number of apartments allowed.
The agreement above referred to, dated October 23, 1950, was prepared by Mr. Ellend (the attorney for the owners of the land), who conferred with and took suggestions from Mr. Darby, the town's attorney. That agreement recites, amongst other things, that the planning board has approved of the project and that the Township of Springfield has tentatively approved of the location of the streets and structures to be laid out and has agreed to accept the dedication of the streets when laid out in accordance with the map submitted (the original August 29, 1950, map). The agreement provides that if the governing body shall amend its zoning ordinance so as to permit the erection of the proposed garden apartments, then the owners will apply for permission so to build and will convey or dedicate the streets shown on the map, and that on the other hand the township would authorize the issuance of building permits "subject to the requirements of the Building Code for the erection of buildings *155 as laid out, after the submission of plans and specifications therefor," and would approve the location of streets and utilities. That agreement was signed by the owners on the date it bears, but was not executed by the township until long after the zoning ordinance was amended and the permit was issued. On January 10, 1951, Mr. Robert F. Darby, the attorney for the township, wrote to Mr. Ellend calling for the map to be attached to the agreement, and in his letter said: "I do not know just how we will overcome the problem of the dating of the map  perhaps by having the map date repeated as August 29, 1950, as revised December, 1950. I think if it is then satisfactorily identified by the initials, it could be attached to the agreement, and would be properly referred to by the language of the agreement." In response to that letter there was delivered to Mr. Darby the map dated August 29, 1950, with the notation "revised December, 1950." The revision concerns a few items not here involved but also shows the number of apartments as 252, and the map so furnished to Mr. Darby was precisely like the map before the township committee on December 6, 1950, when it amended the zoning ordinance, and before the building inspector on December 11, 1950, when he issued the building permit. Mr. Darby attached that map to the agreement, transmitted the same on January 29, 1951, to the township clerk with a letter referring to the annexed map, and suggested that the document be turned over to Mr. Walt Baldwin for his examination. Mr. Baldwin is that member of the township committee who is also a member of the town planning board. The letter further suggests that the agreement, if approved and executed, should be kept by the township or it could be recorded. The agreement was presented to the township committee meeting held on March 28, 1951, and its execution was authorized. It was then signed by the chairman of the township committee and by the town clerk and was recorded by the town attorney on April 4, 1951.
*156 The plaintiff claims that at the December 6, 1950, meeting, when the ordinance was amended, Mr. Ellend made oral representations which induced and justified the belief that the number of apartments would be 182 and not 252, and that this was done by representation as to what would be the density of population. Mr. Ellend, who is a very reputable member of the bar, and other witnesses deny the making of such representations. On this question I must find both factually and legally against the municipality. I find that no such representations were made. As a matter of law I adjudge that such alleged representations are not admissible to vary the executed written agreement, because such oral representations conflict with the parol evidence rule and also with the statute of frauds. On the like question of admissibility I recently reached the same result and holding in the case of Yanow v. Seven Oaks Park, Inc., 18 N.J. Super. 411. Aside from the foregoing, I shall indicate later in this opinion how the alleged representations, if I assume they were made, can be of no influence in this controversy, since the representations were both immaterial and unproductive of any injury to any one.
The complaint charges that the defendants represented to and suffered the plaintiff to believe that the revised map attached to the agreement, showing 252 apartments, contained the same number of apartments and reflected the same population density as the earlier August map, which showed only 182 apartments. I find that not only were there no such representations but that the defendants did not even suffer the township to continue under any false impression concerning the number of apartments to be contained in the buildings. The map before the town committee clearly showed the tabulation of 252, upon which map the building inspector himself made notations. The like map was in the hands of the building inspector before he issued his permit. In July, 1951, some of the buildings had so far progressed that the building inspector, in his required visits to check on construction, must have seen that three-room *157 apartments were already partitioned off and laid out. No three-room apartments were included in the earlier tabulation of 182 apartments. There was no concealment at any time of the number of apartments. As early as April 26, 1951, there appeared on the first page of the Springfield Sun (the local newspaper) a large sketch of the first section of the project, and underneath it appeared descriptive matter which contained the following: "Ultimately the development will have 250 families." It also contained the information that the apartments will range from three to five rooms.
On October 17, 1951, the president of the Colfax Civic Association sent a letter to the township committee pointing out the increase to 250 apartments, resulting in an increase of 68 families, and he said: "We fear that our streets will be used for parking purposes." He added that in view of that fact the road laid out on the map should be narrowed to 12 or 15 feet and he suggested that this would be adequate for fire trucks to pass each other. No complaint is made about the number of families, except as it might mean increased parking on the streets, to prevent which the writer of the letter suggested that the inside street be narrowed. It is the same Colfax Civic Association which later insisted before the township committee that an effort be made by legal proceedings to contract the project to 182 apartments. It is evident from the minutes before me that the authority to bring this action was reluctantly given by the township committee in March of this year.
One additional fact should be mentioned to indicate how the defendants committed themselves in reliance on the project as permitted by their building permit. On June 1, 1951, a written agreement was made with the township committee that if it acquires certain adjacent lands to be used for a 50-foot street and also for a public playground, the defendants would pay the cost thereof up to $5,000 and one-half of any excess, with a limit of $10,000 outlay to them. That commitment has now put the defendants under a contractual obligation of $10,000 for lands which will belong to *158 the township but which will also be beneficial to the development in question.
No question is raised in this case as to any non-compliance with the zoning ordinance or the building code. No violation of either is charged. The ordinance is in evidence and nowhere does it undertake to regulate or control the number of apartments or families in any multiple apartment structure in Residence Zone "D." If it be suggested that density of population is sought to be accomplished by the 20 per cent land coverage provision of the ordinance, then, surely, there can be no objection on that score, for the buildings here cover only 16 per cent of the land. It is, however, charged in the complaint that the township is threatened with additional burdens to its school system, to the sewer sanitation systems of the township, and to the other municipal services required of it. I find from the evidence that no such additional burdens will result, but if they are likely to result they nonetheless constitute no valid objection to the erection as wanted by the defendants and as is permitted by the building permit issued to them. The inadequacy of facilities presently available in a neighborhood cannot support the objection to a building project otherwise permissible under the zoning ordinance and the building code. It is the duty of the municipal authorities to supply all such facilities as the town grows and expands in population and as the need for increased facilities arises. Ingersoll v. South Orange, 3 N.J. Misc. 335 (Sup. Ct. 1925), affirmed 102 N.J.L. 218 (E. & A. 1925); Hendlin v. Fairmount Construction Co., 8 N.J. Super. 310, 328 (Ch. Div. 1950), and the many cases there cited. As was said in that case, the court is not concerned with the economics involved in the performance of the duty resting on the municipal authorities to furnish required facilities as and when and to the extent needed. The duty is paramount.
I am not impressed with the claim that the increase of 70 apartments accommodating 70 additional families necessarily produces a greater number of school children than if *159 the increase were not made. The plans before me show that the revised map calls for 96 three-room apartments whereas the earliest map, that of August, 1950, called for no three-room apartments. These 96 small apartments were created by reducing the number of the larger apartments. The three-room apartments admit only of occupancy by a couple without children. Thus in the court's own judgment the increase here complained of is likely to produce a reduction, rather than an increase, in the number of school children living in this entire development. The defendants' expert says so and I agree with him. I regard the objection based on school attendance completely untenable, factually and legally.
As already stated, the defendants did not by word of mouth or by conduct make the representations which are the basis of this action. Plaintiff's brief seems to suggest that the defendants palmed off a revised map in the place of an earlier map showing a lesser number of apartments. The fact remains, however, that the township committee and the building inspector were as far back as December, 1950, in possession of a map distinctly showing the greater number of apartments and the breakdown tabulation therefor. The plaintiff endeavors to escape this circumstance by saying that these municipal officials were not "conscious" of the change. A mere glance at the tabulation would have sufficed, and I cannot accept the offered explanation that these officials looked but saw not. A like situation was present in the case of Nelson Building Co. v. Greene, 5 N.J. Misc. 331, 136 A. 503 (Sup. Ct. 1927). There the Building Inspector of Weehawken issued a permit for a five-story brick apartment house providing for 30 families. He later attempted to revoke the permit, claiming that its issuance was due to "a misapprehension of the facts presented for my inspection." The building inspector claimed that he thought the plans submitted to him called for a four-story building for 16 families instead of the larger building for more families. The court said: "How he could have been deceived, if he *160 had taken the most cursory view of the plans, is beyond our understanding." Because the owner had proceeded in good faith to demolish an existing building to make room for the new one, the court held that he could not be made to suffer loss on the excuse furnished by the municipality. It should be observed that in the Nelson case the dispute related to an increase of over 100 per cent in the number of apartments.
Even if the court assumed that there had been a switching of maps, as well as misrepresentations as to the number of apartments, there would still not be present such fraud as would justify the relief here sought. Fraud, to be actionable at law or in equity, must be of a material nature and must be injurious. Lembeck v. Gerken, 86 N.J.L. 111, 90 A. 698 (Sup. Ct. 1914); Restatement of the Law of Torts, sec. 538. See also National Manufacturers Co. v. Bird, 97 N.J. Eq. 242, 127 A. 819 (Ch. 1925), in which the court stated: "It is said on behalf of the defendants that fraud without injury is not actionable. This is true." In the present case there is not the slightest evidence to satisfy me that by merely changing the interior layout of the buildings (without increasing their size) thereby reducing the number of six-room apartments and substituting therefor a greater number of three-room apartments, any material change occurred. It would be different if either the zoning ordinance or the building code limited the number of apartments or families. The ordinance here applicable contains no such limitations; hence there was no violation of law in the change. The earlier resistance to the zoning amendment did not touch the question of the number of apartments; it wasn't even mentioned at the several meetings where the zoning amendment was considered. Nor can the public interest be injured by the increase in dispute. The testimony in the case strongly points to the increase being beneficial, in that it makes for a higher-class development to have tenants paying the high rental commanded by these three-room apartments. So inconsequential and so free of injury is this increase that I haven't the slightest doubt that if a permit *161 had been refused to these defendants because their project called for these 252 apartments instead of the 182 previously mentioned, the court would have had no hesitation in compelling the issuance of a building permit.
May a building permit be revoked once the holder thereof has, in reliance thereof, altered his position by expenditure of money or by committing himself contractually? The answer furnished by many decisions in our State is in the negative, subject to the single qualification that the permit must not have been obtained by fraud. Of course, the fraud necessary to vitiate the grant of a building permit must be of the character already mentioned; namely, material and injurious. Only a few cases need be cited for the principle that in the absence of such fraud a building permit is irrevocable where under it the holder has spent money or created contractual obligations. Freeman v. Hague, 106 N.J.L. 137, 147 A. 553 (E. & A. 1929); Pabst v. Ferner, 151 A. 368, 8 N.J. Misc. 621 (Sup. Ct. 1930); Kornylak v. Hague, 150 A. 669, 8 N.J. Misc. 481 (Sup. Ct. 1930); Lehigh Valley R.R. Co. v. Jersey City, 144 A. 578, 7 N.J. Misc. 154 (Sup. Ct. 1929), affirmed 106 N.J.L. 248, 147 A. 555 (E. & A. 1929); Nelson Building Co. v. Greene, supra.
I hold that in the circumstances of this case the building permit here involved is irrevocable.
The defendants have by amendment to their answer pleaded laches. The facts found by me and above stated clearly indicate that the municipality stood by while the defendants proceeded to complete at vast expense 11 of the 24 buildings and to commence the erection of one or more of the remaining 13 structures. In connection with the remaining buildings large sums of money have been spent in preparatory work, in the installation of utilities, and in the laying of foundations in one or several of those buildings. Even more important is the fact that contractual commitments running into more than a million dollars have been entered into, including a contract whereby the defendants must contribute up to $10,000 towards the plaintiff's cost of *162 acquiring adjacent lands for a street and a playground. I can conceive of no case in which, in reliance upon a building permit, the holder thereof could more seriously have altered his position. Certainly as between private persons the claim of laches, here made, would be beyond all question. Is the situation altered by the circumstance that the plea of estoppel by laches is urged against a public body, a municipality? I shall deal with that question presently, but before doing so point out that in the many cases where because of expenditure of moneys by the owner his permit was held to be irrevocable by the municipality the underlying principle was that of estoppel. The plaintiff, however, refers to the case of Clifton v. Cresthaven Cemetery Assn., Inc., 136 N.J. Eq. 56, 40 A.2d 352 (Ch. 1944), where Vice-Chancellor Lewis did say that "The principle of estoppel or of laches does not apply against the public authorities of a city." That case did not go up on appeal and has never been cited for the point. That case distinctly overlooks what was already the contrary law of this State, settled by our court of last resort. As early as 1876, and even before, it was held that where persons have proceeded to make immense expenditures upon their enterprise, in the confidence that they were acting under proper authority, "equity will refuse its aid, even to the state, leaving it to its remedy at law." Attorney-General v. Delaware and Bound Brook R.R. Co., 27 N.J. Eq. 1, 25 (Ch. 1876), affirmed 27 N.J. Eq. 631 (E. & A. 1876). See also opinion of Vice-Chancellor Van Fleet in Traphagen v. Mayor and Aldermen of Jersey City, 29 N.J. Eq. 206, 208 (Ch. 1878), in which the court said it would refuse to exert its prohibitory power even in aid of the state if the state's representatives "by silence and inaction, have presumably encouraged the outlay of large sums of money in the prosecution of an important public enterprise, undertaken in good faith, and which, if arrested, would bring disaster upon its projectors." The Traphagen case was unanimously affirmed on the opinion below. See 29 N.J. Eq. 650 (E. & A. 1878). In Attorney-General v. Central Railroad Co., 68 N.J. Eq. 198, 226, 59 A. 348 (Ch. 1904), unanimously affirmed 70 *163 N.J. Eq. 797, 66 A. 418 (E. & A. 1906), the court said: "The equitable rules relating to the effect of laches and acquiescence are enforced against the state when it is a suitor for equitable relief as well as against private suitors." The foregoing declarations control. They are not mentioned in the opinion of the vice-chancellor in Clifton v. Cresthaven Cemetery Assn., Inc., supra, which omission was undoubtedly an oversight. I therefore hold that in the instant case the plaintiff's action is barred by laches.
Plaintiff's counsel states in his brief that it is not the purpose of the plaintiff "at this time" to bring into the case the possible illegality of the contract between the plaintiff and the owners and builders, but nonetheless he refers to the recent case of Houston Petroleum Co. v. Automotive Products Credit Association, Inc., 9 N.J. 122 (1952), in which our Supreme Court held that a certain collateral agreement made in connection with a zoning ordinance was ultra vires, because such contracts have no place in a zoning plan. Plaintiff's counsel assures the court that in referring to that decision "it is not the objective of the plaintiff to harass the defendants." Yet it seems that the matter is one which plaintiff holds in reserve for future attack on the project, a course which can hardly be tolerated. The pendency of this action must of necessity have halted the project. Prudent business men will not advance their funds on a project that may be strangulated before completion. It would be extremely unfair for the plaintiff hereafter to attack the contract on a ground presently known to exist. The defendants are not seeking the condemnation of that contract and express no desire to deprive the plaintiff municipality of its benefits thereunder. The plaintiff, however, wishes to hold that contract in reserve and perhaps at some future date attack both the contract and the ordinance itself. Reservations of such character have twice been condemned by our courts, first in Den v. Geiger, 9 N.J.L. 225, 239 (Sup. Ct. 1827) and, secondly, in Armour v. Armour, 138 N.J. Eq. 145, 160 (E. & A. 1946). In each of those cases the court condemned the bringing in of what it called a "corps de *164 reserve," and used the same language: viz., "Neither convenience, nor economy of time, nor candor of practice will permit. To bring out the defendant, as one of the plaintiff's counsel expressed himself, cannot be countenanced. In this warfare nothing is admitted but fair, open and honorable combat. No feints, no strategems, no ambuscades." Although the pleadings do not raise either the question of ultra vires of the contract or the validity of the zoning ordinance itself, the question has been injected into the case by plaintiff's brief and justice dictates that it be disposed of here and now. The municipality itself cannot question the validity of its own ordinance. If it becomes discontent therewith, the remedy lies in repeal or amendment, which course cannot adversely affect rights theretofore acquired under the sanction of the ordinance. As to the contract, its vitiation would not affect the defendants' rights under their building permit. It would merely relieve the defendants from performing certain obligations with respect to streets and utilities, something which the defendants do not seek and which relief would be harmful to the municipality. It need only be added that even if the contract were held to be invalid, the amended zoning ordinance would nonetheless continue to be valid until repealed or amended by the town's governing body.
During the trial and from the proofs I became aware of the strong clamor, by those who originally resisted the zoning amendment, that the present project be contracted in the manner already indicated. I also perceived the reluctance on the part of the members of the township committee in the bringing of this action. The court can understand their local embarrassment but cannot attach to it the slightest weight. In the case of Morris and Essex Railroad Co. v. City of Newark, 10 N.J. Eq. 352, 356 (Ch. 1855), the Chancellor pointed out how entirely uninfluential is local feeling in the adjudication of property rights when he said: "The public excitement which existed in the city of Newark did not make this court falter one moment in discharge of its duty."
The relief sought by plaintiff is denied. A judgment for the defendants may be entered.