HOUSING AUTHORITY OF THE CITY OF ATLANTIC CITY A/K/A HOUSING AUTHORITY AND REDEVELOPMENT AGENCY OF ATLANTIC CITY, PLAINTIFF-RESPONDENT AND CROSS-APPELLANT, v. THE STATE OF NEW JERSEY, DEFENDANT-APPELLANT AND CROSS-RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued February 1, 1984—Decided March 5, 1984.

Before Judges FRITZ, FURMAN and DEIGHAN.

*Elias Abelson,* Assistant Attorney General, argued the cause for appellant, cross-respondent, (*Irwin I. Kimmelman,* Attorney General, attorney; *Deborah T. Poritz,* Deputy Attorney General, of counsel).

*Charles Lee Harp, Jr.,* argued the cause for respondent, cross-appellant (*Archer & Greiner,* attorneys; *Kirkman, Mulligan, Bell & Armstrong,* attorneys; *William R. Serber,* of counsel).

The opinion of the court was delivered by

FURMAN, J.A.D.

At issue on appeal is whether the State established in a non-jury trial its sovereign title to formerly tide-flowed lands which became fast land above mean high tide sometime in the spring of 1870. The premises in dispute extend between New Jersey and Delaware Avenues in Atlantic City inland from the

Boardwalk. Plaintiff Housing Authority of Atlantic City, which acquired title to the premises for over one million dollars in 1966 and 1967 as part of an urban redevelopment project, brought this action to quiet title against the State. From an adverse judgment the State appeals.

In a published opinion at 188 *N.J.Super.* 145 (Ch.Div.1983), Judge Gibson denied plaintiff's pretrial motion for summary judgment on the ground of estoppel against the State. Plaintiff cross-appeals from that denial. On its motion for summary judgment plaintiff relied on three riparian deeds, two in 1878 and one in 1899, to its predecessors in title and on the State's course of conduct in not disputing upland ownership for over 100 years. The riparian deeds conveyed submerged lands seaward from the mean high water line. In ruling in favor of the State Judge Gibson recognized that the State, in conveying riparian lands, accepts the existing mean high water line without examining tidal survey maps or otherwise investigating the upland owner's title.

Trial to resolve the title dispute then proceeded. Judge Gibson fixed the burden of proof on the State as the party challenging the existing physical scene, in accordance with *O'Neill v. State Hwy. Dept.,* 50 *N.J.* 307, 327 (1967). That ruling is not in issue on appeal.

The State's theory of tidelands title is without supporting precedent in the more than 150 years of reported opinions in this State adjudicating ownership to lands which were at the time of the litigation or formerly tide-flowed, *see e.g. Arnold v. Mundy,* 6 *N.J.L.* 1 (Sup.Ct.1821). That theory is that the high water line shifted seaward up to 150 feet in an avulsion, a sudden and perceptible welding of a sandbar to the upland through tidal action.

In pressing its novel theory, the State relies upon dicta or implications in reported opinions that, just as private title to what had been fast land is not lost as the result of a channel breakthrough or other violent shift, so State title to what had

been tide-flowed land is not lost as the result of a sudden and perceptible avulsion. *See Ocean City Association v. Shriver,* 64 *N.J.L.* 550, 555–560 (E. & A.1900); *Garrett v. State,* 118 *N.J.Super.* 594, 601 (Ch.Div.1972).

Neither does the State cite any English or other out-of-state reported opinion applying the doctrine of avulsion to a seaward shift of the mean high water line. We do not consider *Bauman v. Choctaw-Chickasaw Nations,* 333 *F.2d* 785 (10 Cir.1964), *cert.* den. 379 *U.S.* 965, 85 *S.Ct.* 658, 13 *L.Ed.2d* 559 (1965), which the State relies on, to be a parallel avulsion case. The holding in *Bauman* is that title to land which had been on one side of a meandering river was not lost because a sudden change in the river channel shifted the premises to the opposite side. Uniformly in reported opinions applying the avulsion doctrine the factual background, as in *Bauman,* has been a channel breakthrough or other violent flooding of land, which may have the incidental consequence of an addition to fast land nearby; none has dealt factually with a sudden and perceptible welding of a sandbar to fast land through tidal action, as the State contends happened here.

The converse of avulsion is accretion, a gradual and imperceptible addition to fast land by operation of natural forces, water and, it may be, wind, over an extended period of time. Title to adjoining fast land formed by accretion remains in the upland owner, *Borough of Wildwood Crest v. Masciarella,* 51 *N.J.* 352, 357 (1968).

Plaintiff contends that the joinder of the sandbar to the fast land at this site was by the gradual process of accretion. The issue before us, narrowly stated, is whether the State sustained its burden of proving that in the spring of 1870 the high water line at the premises in dispute shifted seaward suddenly and perceptibly, that is, avulsively, and not gradually and imperceptibly, that is, accretively.

The State relied for its proofs of coastal shifts more than 110 years ago on the contemporaneous reports and logs of the

keeper of the Absecon Lighthouse, 1000 feet away, concededly an overview; on a topographical survey by the United States Coast and Geodetic Survey in 1869; on a succession of survey maps showing the high water line at the site in the 1860's and 1870's by engineers of the 4th Lighthouse District; and on expert opinion testimony by Dr. Fitzgerald, a coastal geologist. The State introduced in evidence a clipping from the New York Times of March 31, 1870 reporting a gale in the area but made no attempt to correlate that storm to avulsive welding of a previously submerged sandbar to the upland.

The lighthouse keeper over a period of months in 1869 and early 1870 reported a large sandbar offshore, as much as 300 to 500 feet wide and half a mile long. He makes no reference to a sudden and perceptible welding of that sandbar to the shoreline. The State's primary reliance for that proof, critical to its case, was upon two successive survey maps by the lighthouse district engineers, one in March 1870 and the second dated May 2, 1870, which may have been nearer to one month than two months apart because the March map was undated. Between those two surveys, the high water line at the site had shifted seaward 50 to 150 feet.

Dr. Fitzgerald's expert opinion based on this record was that the sandbar migrated landward in March and April 1870 only during spring tides, the highest tides, in cycles of 12 hours total in two weeks or of 48 hours total in two months, and that the final welding of the sandbar to the shoreline was a "discrete event".

Plaintiff housing authority countered with expert opinion testimony by Dr. Farrell, also a coastal geologist. Accepting as a fact a major shift of the high water line seaward between March and May 1870, Dr. Farrell hypothesized that the final welding of the sandbar to the shoreline was not necessarily a discrete event; that just as plausibly the build-up and landward migration of the sandbar had been an extended process; and that, drawing upon his own observations of similar coastal shifts

north of Absecon Island, he considered it likely that, prior to final welding, there had been a trough between the steep "slip face" of the sandbar and fast land, which filled only gradually with sand and sediments.

From the evidence, including the conflicting expert opinion testimony, Judge Gibson determined that the State had failed to sustain its burden of proving a sudden and perceptible avulsive joinder of the sandbar to fast land by a storm or otherwise. He did not accept Dr. Fitzgerald's opinion that the final welding was a discrete event. He found the shifting of the sandbar "more or less gradual and generally imperceptible". He concluded as a matter of law that landward migration and welding of the sandbar to the shoreline within the two month period, or something less, from March to May 1870 was not "sufficiently rapid" to represent an avulsion.

Judge Gibson's factual determinations were reasonably reached on the record before him and should be sustained on appeal, *Rova Farms Resort v. Investors Ins. Co.*, 65 *N.J.* 474, 484 (1974). We agree also with his legal conclusion that, even if accepted as factually true, proof of a landward migration of the sandbar over a two month period culminating in its joinder to the shoreline at high tide did not establish an avulsive change paralleling, in terms of tidelands law, a channel breakthrough or flood. Rather, such proof was consistent with a gradual and imperceptible accretion by operation of natural forces over an extended period of time.

In view of our affirmance of Judge Gibson's judgment in favor of plaintiff housing authority, we need not and do not pass upon the issue raised on plaintiff's cross-appeal: whether the State was estopped to challenge plaintiff's title because of its three prior riparian grants and its course of conduct over many years, 188 *N.J.Super.* 145.

We affirm on the appeal. We dismiss on the cross-appeal.